**GRAHAM PACKAGING COMPANY, LP, Petitioner**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 9, 2005.

Decided Sept. 15, 2005.

Patricia Carey Zucker, Harrisburg, for petitioner.

Ronald H. Skubecz, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and LEADBETTER, Judge (P.), and KELLEY, Senior Judge.

OPINION BY Judge LEADBETTER.

Petitioner Graham Packaging Company, L.P., petitions for review of the order of the Board of Finance and Revenue (Board), which denied its request for a refund of the sales tax it paid in connection with the renewal of various "canned" computer software licenses in October 1999.[1] The issue on appeal is whether fees paid to renew the licenses to use the software programs are taxable under Section 202 of the Tax Reform Code of 1971 (Code), Act of March 4, 1971, P.L. 6, as amended, 72 P.S. § 7202. In order to resolve this issue, we must answer the fundamental question whether canned computer software programs constitute "tangible personal property" for purposes of the Code.

 Graham Packaging designs, manufactures, and sells customized blow-molded plastic containers that are used for food, beverages and household products. Graham uses various computer software programs in connection with its business. On October 4, 1999, Graham paid over $395,000.00 to Dell for a two-year renewal of multiple licenses to use various canned computer software programs, such as Windows NT and Office Pro 2000 that it had purchased previously from Dell. In connection with the license renewals, Graham paid sales tax in the amount of $22,379.40. Thereafter, Graham petitioned for a refund of the sales tax paid, which both the Board of Appeals and the Board of Finance and Revenue denied. The instant appeal followed.[2]

In connection with the appeal to this court, the parties entered into a stipulation of facts which states, among other things, that: (1) users of software programs do not own the software program; rather, users purchase the right to use the program in accordance with the licensing agreement and copyright law; (2) computer disks are often provided free of charge to multiple user license holders; (3) computer disks do not give users rights of ownership to the software; (4) computer disks remain the property of the licensor of the software program; (5) the physical delivery of the computer software program can be accomplished without the transfer of the computer disk and the computer disk is not necessary for the use of the program; (6) the physical quality of the computer disk does not affect the price of the computer software program; (7) Graham paid Dell for two-year license renewals of software licenses previously purchased by Graham; (8) the delivery of the computer software sold to Graham was originally accomplished by disk; (9) the license renewals at issue did not involve computer disks; and (10) the original computer disks were obsolete at the time of

---

1. "Canned software" has been defined by the Department of Revenue as: "Computer software that does not qualify as custom software." 61 Pa.Code § 60.19(b). "Custom software" is defined in turn as, "[c]omputer software designed, created and developed for and to the specifications of an original purchaser." *Id.*

Electronic Data Systems Corporation has filed an appellate brief as *amicus curiae.*

2. This court's review of an appeal from the Board is de novo and is based on either a record created before this court or stipulated facts. Pa. R.A.P. 1571; *Plum Borough Sch. Dist. v. Commonwealth,* 860 A.2d 1155 (Pa. Cmwlth.2004).

the license renewals. *See* Stipulation of Facts (filed March 2, 2005).

■ In determining whether the renewal of the software licenses was a taxable transaction, we begin with the applicable statutory and regulatory provisions.[3] Pursuant to Section 202(a) of the Code, a six percent tax is imposed on "each separate sale at retail of tangible personal property or services, as defined herein, within this Commonwealth...." 72 P.S. § 7202(a). A "sale at retail" is defined, in turn, as "[a]ny transfer, for a consideration, of the ownership, custody or possession of tangible personal property, *including the grant of a license to use or consume* whether such transfer be absolute or conditional and by whatsoever means the same shall have been effected." Section 201(k)(1) of the Code, 72 P.S. § 7201(k)(1) (emphasis added). "Tangible personal property" is defined, in part, by the Code as "[c]orporeal personal property including, but not limited to, goods, wares, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use, prepaid telecommunications, premium cable or premium video programming service, spirituous or vinous liquor ... interstate telecommunications service originating or terminating in the Commonwealth...." Section 201(m) of the Code, 72 P.S. § 7201(m). Thus, if the canned computer software programs are deemed to be "tangible personal property," then the amounts paid to renew the software licenses are properly taxed because the grant of a license to use tangible personal property for a fee is considered a "sale at retail."

Prior to July 1, 1997, Section 201 of the Code expressly included in the definition of "sale at retail" the "rendition for a consideration of computer programming services; computer-integrated systems design services; computer processing, data preparation or processing services; information retrieval services ... [and] other computer-related services." 72 P.S. § 7201(k)(16) [repealed by the Act of May 7, 1997, P.L. 85 (hereinafter "1997 Act" or "1997 Amendments")]. "Computer programming services" were defined in former Section 201(dd) as:

> Providing computer programming or computer software design and analysis. Such services include, but are not limited to, services of the type provided by or through computer programming services, customer computer programming services, computer code authors and free-lance computer software writers, software modification, custom software programming, custom computer programs or system software development, custom computer software systems analysis and design, custom applications software programming, computer code authors or free-lance computer software writers.

72 P.S. § 7201(dd) (repealed by the 1997 Act). Notably, canned software did not fall within the definition of "computer programming services."[4]

---

**3.** It bears noting that tax statutes must be strictly construed against the Commonwealth and reasonable doubts regarding their application must be resolved in favor of the taxpayer. *Plum Borough Sch. Dist.*, 860 A.2d at 1157 [citing 1 Pa.C.S. § 1928(b)(3)].

**4.** Canned software programs did not fall within the definition of "other computer-related services" either. "Other computer-related services" was defined as:

> Supplying computer-related services not described elsewhere in clauses (dd) through (hh). Such services include, but are not limited to, computer consulting services; data base development and data processing consulting services; disk, diskette or tape conversion services; disk, diskette or tape recertification services; computer hard-

■ The Department of Revenue (Department) statement of policy[5] that was in effect until June 30, 1997, provided that the performance of computer services, which was defined to include writing or modifying computer programs and customized computer software programs, results in a service or tangible personal property which is transferred to the purchaser. 61 Pa.Code § 60.13(b)(1)(i). The statement of policy also provided: "(1) The following are examples of taxable computer programming services: ... (iii) The sale of a license to use canned or custom software applications. *Canned software is tangible personal property. Custom software is a computer service.*" *Id.* at (c)(iii) (emphasis added). Thus, prior to the 1997 amendments to the Code, canned computer software programs were treated as taxable

tangible personal property and custom computer software programs were expressly identified as a taxable computer programming service.

Following the 1997 amendments, which deleted custom computer-related services from the definition of "sale at retail," the Department issued a statement of policy, effective July 1, 1997, which provides in pertinent part:

> (a) Scope. Effective July 1, 1997, the rendition of computer programming, computer integrated systems design, computer processing, data preparation or processing, information retrieval, computer facility management and other computer-related services, as defined under repealed section 201(dd)—(ii) of the [Code] (72 P.S. § 7201(dd)—(ii)), are no longer subject to Sales or Use Tax.

> ware and software requirement analysis services; software documentation services; software installation services; software training services if provided in conjunction with the purchase of software; or reformatting or editing services.

5. Section 102 of the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended,* defines a "statement of policy" as:

> [A]ny document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document interpreting or implementing any act of Assembly enforced or administered by such agency.

Section 102(13) of the Commonwealth Documents Law, 45 P.S. § 1102(13).

61 Pa.Code § 3.2 provides that the Department issues statements of policy in two forms: revenue pronouncements and revenue rulings. Revenue pronouncements are used to interpret law or regulations, "[a]nnounce formally the guidelines or policies that the Department expects to implement in a future regulation or to follow in a future adjudication," "[e]xplain an administrative procedure

within the discretion of the Department," or "[i]mplement an act of Assembly if the Department finds it is unnecessary to use regulatory powers to perform its duties and responsibilities." *Id.* A revenue ruling is used "to provide guidelines and interpretations by advising the public of the Department's application of the tax laws to a general factual situation." *Id.* A revenue ruling "is issued when the Department believes that broad public dissemination is appropriate to ensure uniformity in the application of the law to a common factual situation." *Id.*

A "regulation" is defined by the Commonwealth Documents Law as "any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency." Section 102(12), 45 P.S. § 1102(12).

While regulations must be promulgated in accordance with the notice and comment procedures of the Commonwealth Documents Law, statements of policy need not comply with such procedures. *Prof'l Ins. Agents Ass'n v. Koken,* 777 A.2d 1179 (Pa.Cmwlth. 2001). Moreover, it is well-established that a properly promulgated regulation has the force of law while a statement of policy does not. *Id.*

*The sale-at-retail or use of computer hardware and canned software, as well as services thereto, remains subject to sales and use tax as the sale-at-retail or use of tangible personal property* and is not affected by the repeal of Section 201(dd)—(ii) of the [Code].

. . . .

(c) Application.

. . . .

(2) Computer software.

(i) *Canned software.*[6] *The sale at retail or use of canned software, including updates, enhancements and upgrades is subject to tax.*

(A) Canned software includes custom software that is transferred pursuant to a sale at retail to a person other than the original purchaser.

(B) Computer software designed, created and developed to adapt or modify canned software to the specific needs of a particular customer does not convert the canned software to custom software. . . .

(C) A vendor's transfer for consideration to a purchaser of the temporary ownership, possession or custody of a storage medium[7] containing canned software for the purpose of being used or recorded by either the purchaser or vendor on the purchaser's computer hardware is subject to tax.

. . . .

(ii) *Custom software.*[8] *The sale at retail or use of custom software is not subject to tax. The sale at retail or use of custom software constitutes a pur-*chase of a *non-taxable computer programming service.*

(A) The sale at retail or use of multiple copies or licenses of custom software to the original purchaser is not subject to tax.

(B) The sale at retail or use of custom software installation, custom software repair and maintenance, custom software updates, enhancements and upgrades that constitute custom software is not subject to tax.

61 Pa.Code § 60.19 (emphasis and footnotes added). Thus, these statements of policy categorize canned computer software as tangible personal property subject to tax and custom computer software to be a nontaxable computer programming service.

■■■ More recently, the Department issued a revenue ruling in February 2000 that appears to be somewhat inconsistent with its statement of policy appearing at 61 Pa.Code § 60.19, in that it indicates that the purchase of canned software that is transmitted electronically is not subject to tax while the purchase of the same software, recorded and delivered on tangible media, is subject to tax because it has a physical material body. The revenue ruling further provides that "charges for canned software updates that are part of a maintenance contract, and that are delivered electronically, are also not subject to tax." *Id. See* Sales and Use Tax Ruling, No. SUT–99–024, attached to Graham's appellate brief as Appendix E. Specifically, the Commonwealth reasoned in its ruling that it "taxes the sale of canned computer software for the same reason that it taxes the sale of books, pre-recorded audio and

---

6. *See* footnote 1, *supra.*

7. "Storage media" is defined as "hard disks, compact disks, floppy disks, magnetic tape, cards and other tangible medium used for the

storage of computer readable information." 61 Pa.Code § 60.19(b).

8. *See* footnote 1, *supra.*

video tapes, and any other type of information recorded on a tangible medium: they all qualify as corporeal personal property. Canned computer software that is delivered electronically does not have a physical material body; it is not corporeal." *Id.* While this ruling appears no longer to be in effect, the Department continues to maintain this position. *See* Sales and Use Tax Ruling, No. SUT–03–001 (January 16, 2003).

We now turn to the parties' legal arguments, keeping this statutory/regulatory framework in mind. On appeal, Graham contends that the amounts paid for the renewal of licenses to use the canned software programs are not taxable because the 1997 Amendments to the Code constituted a comprehensive repeal of the tax on computer programming services, which Graham believes included canned software.[9] Graham argues that, since the statement of policy in effect prior to the 1997 amendments to the Code (61 Pa.Code § 60.13) expressly provided that the sale of a license to use canned software constituted a taxable "computer programming service," and since "computer programming services" have now been deleted from the definition of "sale at retail," a license to use canned software is no longer taxable under the Code. Graham also notes that, while the current statement of policy at 61 Pa.Code § 60.19 indicates that the sale of canned software remains subject to tax,

the policy is silent as to licenses to use canned software. Accordingly, Graham contends that, since there is no statutory or regulatory authority authorizing the imposition of a sales or use tax on licenses to use canned computer software programs, imposition of a tax is unauthorized and improper.

Graham further contends that, since the license renewals are not effectuated by the delivery of computer disks, no corporeal tangible personal property was transferred for use in the renewal of the licenses. In support of this argument, Graham points to the Department's revenue ruling at SUT–99–024, which provides that an electronic transfer of canned software unaccompanied by disk is not a taxable event.[10]

On the other hand, the Commonwealth maintains the position set forth in its recent revenue rulings that canned software delivered by disk constitutes tangible personal property as that term is defined by the Code and, therefore, since a license to use tangible personal property is considered a taxable "sale at retail," the license renewals at issue here were properly taxable. According to the Department, the repeal of the tax on computer programming services in 1997 did not affect the continued taxability of purchases of canned software that are transferred on a disk, which always were and continue to constitute tangible personal property.[11] The

---

9. Graham relies on legislative journals to support this claim. Our review of the journal pages appended to Graham's brief reveals that the comments made regarding the 1997 Act were very general in nature.

10. While not stipulated to, in response to questioning by the court during oral argument, Graham's counsel stated that the license renewals pertain to upgraded programs and that, if the original program were still being used, the licenses would not need to be renewed.

11. The Commonwealth cites to *Advent Systems, Ltd. v. Unisys Corporation,* 925 F.2d 670 (3d Cir.1991), as representative of its view. In *Advent,* the court concluded that software constituted a "good" for purposes of the Uniform Commercial Code (UCC). There, the court stated:

Computer programs are the product of an intellectual process, but once implanted in a medium are widely distributed to computer owners. An analogy can be drawn to a compact disc recording of an orchestra rendition. The music is produced by the

Commonwealth focuses solely on the form of the delivery as determinative of whether the transaction involves tangible personal property. Thus, if a copy of the canned software is transferred to the purchaser via some tangible medium such as a disk, the Commonwealth views the transaction as one involving tangible personal property, warranting the imposition of the tax. However, if the very same program is conveyed to the purchaser electronically, via email or downloading, such that tangible storage media is not used, the transaction is not taxable.[12] We believe that both parties' interpretations miss the mark.

Our research has not revealed any appellate decisions in this Commonwealth, and the parties have not cited to any, that define the term "tangible" or "corporeal" personal property within the meaning of the statute, let alone address whether canned computer software falls within its ambit. Other jurisdictions have considered the issue, however, employing different analytical frameworks and reaching contradictory results.[13] This diversity of analysis and results is not surprising, as both software and other forms of current technology do not fit squarely into our less than modern, traditional concepts of tangible property. In addition, of course, the various statutes at issue are not identical to ours. Nonetheless, we find these analyses illuminating.

Some jurisdictions, seeking to distinguish between tangible personal property and intangible property or a service, adopt a view similar to that espoused by the Commonwealth here. This approach adheres to traditional notions of the terms "tangible" and "corporeal" and concludes that some physical matter must be involved in the sale, although it need not be the "focus of the transaction." Thus, the form or manner in which software is transferred controls the tax consequences; if a program is conveyed on media such as a disk, then it constitutes tangible personal property regardless of whether it could have been conveyed electronically. An electronic transfer of the same program, on the other hand, is not taxable as a sale of tangible personal property. *See Citizens & S. Sys., Inc. v. S. Carolina Tax Comm'n*, 280 S.C. 138, 311 S.E.2d 717 (1984); *Chittenden Trust Co. v. King*, 143

---

artistry of musicians and in itself is not a "good" but when transferred to a laser-readable disc becomes a readily merchantable commodity. Similarly, when a professor delivers a lecture, it is not a good, but when transcribed as a book, it becomes a good.

That a computer program may be copyrightable as intellectual property does not alter the fact that once in the form of a floppy disc or other medium, the program is tangible, moveable and available in the marketplace....

*Id.* at 675. A "good" is defined by the UCC as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale...." 13 Pa.C.S. § 2105.

12. It does not appear that the Board drew this distinction. As noted earlier, the Department appears to have maintained two different positions in that its statement of policy indicates that *all* canned software constitutes tangible personal property, while its revenue ruling of February 2000 was consistent with the argument now pressed on appeal.

13. Many jurisdictions have treated the issue legislatively. *See, e.g.*, Conn. Gen.Stat. § 12-407(13) (tangible personal property defined to include canned or prewritten computer software for sales and use tax), 35 Ill. Comp. Stat. § 105/3-25 (designating canned or prewritten software as tangible personal property for use tax), Tex. Tax Code § 151.009 (tangible personal property defined to include computer programs for sales tax provisions), Utah Code § 59-12-102 (tangible personal property defined to include prewritten computer software for sales and use tax), and Wis. Stat. § 77.51 (tangible personal property defined to include computer programs except custom computer programs for sales and use tax).

Vt. 271, 465 A.2d 1100 (1983). *See also Mark O. Haroldsen, Inc. v. State Tax Comm'n*, 805 P.2d 176 (Utah 1990).

Other courts apply a test often referred to as the "essence of the transaction" test or the "true object" test. The test applies when a transaction appears to involve both tangible and intangible property or tangible property and a service. In order to determine whether a taxable sale of tangible personal property has occurred, the test focuses on whether the essence or true object of the sale is tangible personal property or intangible property or a service with tangible property serving only as the medium of transmission. If the essence of the transaction or true object of the transaction is the intangible property or service, the intangible object/service does not assume the taxable character of the tangible property serving as the medium of transfer. *See generally* 68 Am. Jur.2d Sales and Use Taxes § 62.

For instance, in *First National Bank of Fort Worth v. Bullock*, 584 S.W.2d 548 (Tex.App.1979), the court addressed whether canned computer software was tangible personal property for purposes of a sales and use tax. While the software was transferred to the purchaser on magnetic tapes, the evidence demonstrated that it could have been transmitted by other methods, including the telephone. Tangible personal property was defined by Texas at that time as "personal property which may be seen, weighed, measured, felt or touched, or which is in any other manner perceptible to the senses." [14] *Id.* at 550 [citing Tex. Tax. Gen. Ann. art. 20.01(P)(1969)]. To determine whether the software was tangible personal property, the court applied the essence of the transaction test. The court concluded that the object of the transaction was not the tapes, but the purchase of a "computer process, an intangible." *Id.* In reaching this conclusion, the court emphasized that the desired information could have been transmitted without involving a tangible object, and unlike a record or film, once the information on the tape was transferred to the computer, the tape was of very little value to the user. This test was later reaffirmed in 1996 *in Dallas Central Appraisal District v. Tech Data Corp.*, 930 S.W.2d 119 (Tex.App.1996). [15] *See also Northeast Datacom, Inc. v. City of Wallingford*, 212 Conn. 639, 563 A.2d 688 (1989) (concluding that both canned and custom software were intangible property and rejecting view that if one has intangible property that is temporarily fixed in a tangible medium, the tax authority may tax as tangible personal property the value of the tangible medium plus the value of the intangible personal property); *CompuServe, Inc. v. Lindley*, 41 Ohio App.3d 260, 535 N.E.2d 360 (1987); *Globe Life & Accident Ins. Co. v. Oklahoma Tax Comm'n*, 913 P.2d 1322 (Okla.1996).

Other jurisdictions, however, have reached the opposite conclusion under the essence of transaction test. While agreeing that the medium or other mechanism

---

**14.** As noted above, Texas has since amended its Tax Code to include software in its definition of tangible personal property.

**15.** In *Dallas Central*, the credited evidence described software as "intellectual property consisting of binary instructions, programs, routines, and symbolic mathematical code that controls the functioning of computer hardware and directs hardware operations .... [as well as] [un]perceivable binary pul-

ses" that do not need to be "packaged in tangible form." 930 S.W.2d at 122. Applying a virtually identical definition of "tangible personal property" as that applied in *First National Bank*, the court concluded that the software was intangible property because the "essence of the transaction" was the software and not the tangible medium on which it might be stored. *Id.* at 123.

used to transfer the program software is irrelevant, they take a different view of the nature of the program itself and come to a broader—and arguably more contemporary—understanding of the term "tangible property." In *South Central Bell Telephone Co. v. Barthelemy*, 643 So.2d 1240 (La.1994), the Supreme Court of Louisiana addressed whether software constituted tangible personal property for purposes of a city sales and use tax. South Central Bell Telephone (Bell) purchased licenses to use switching software and data processing software. The switching software was delivered by magnetic tape and the data processing software was transmitted electronically. The city levied use taxes on Bell's use of both types of software pursuant to a city code provision imposing a use tax on the use of tangible personal property. The city code defined "tangible personal property" as "[p]ersonal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses . . . ." *Id.* at 1243. Louisiana courts equated that definition with "corporeal movable property" or "all things that make up the physical world," distinguishing the phrase from incorporeals or intangibles, or those things that encompass the "non-physical world of legal rights." *Id.*

Considering various publications and legal periodicals discussing the nature of software, the Louisiana court noted as follows:

> When stored on magnetic tape, disc, or computer chip, this software, or set of instructions, is physically manifested in machine readable form by arranging electrons, by use of an electric current, to create either a magnetized or unmagnetized space. The computer reads the pattern of magnetized and unmagnetized spaces. . . . This machine readable language or code is the physical man-

ifestation of the information in binary form.

*Id.* at 1246 (citations omitted). While this description of software is very similar to that discussed in cases concluding that software is intangible personal property, the court rejected the argument that software represented merely incorporeal knowledge or intelligence. Rather, the court opined:

> The software at issue is not merely knowledge, but rather is knowledge recorded in a physical form which has physical existence, takes up space on the tape, or disc, or hard drive, makes physical things happen and can be perceived by the senses. As the dissenting judge [below] pointed out, "In defining tangible, 'seen' is not limited to the unaided eye, 'weighed' is not limited to the butcher or bathroom scale, and 'measured' is not limited to a yardstick." That we use a read/write head to read the magnetic or unmagnetic spaces is no different than any other machine that humans use to perceive those corporeal things which our naked senses cannot perceive.
>
> The software itself, i.e., the physical copy, is not merely a right or an idea to be comprehended by the understanding. The purchaser of computer software neither desires nor receives mere knowledge, but rather receives a certain arrangement of matter that will make his or her computer perform a desired function. This arrangement of matter, physically recorded on some tangible medium, constitutes a corporeal body.
>
> We agree with Bell and the court of appeal that the form of the delivery of the software—magnetic tape or electronic transfer via modem—is of no relevance. However, we disagree with Bell and the court of appeal that the essence or real object of the transaction was

intangible property. That the software can be transferred to various media, i.e., from tape to disk, or tape to hard drive, or even that it can be transferred over the telephone lines, does not take away from the fact that the software was ultimately recorded and stored in physical form upon a physical object. As the court of appeal explained, and Bell readily admits, the programs cannot be utilized by Bell until they have been recorded in the memory of the [equipment]. The essence of the transaction was not merely to obtain the intangible "knowledge" or "information", but rather, was to obtain recorded knowledge stored in some sort of physical form that Bell's computer could use. Recorded as such, the software is not merely an incorporeal idea to be comprehended, and would be of no use if it were. Rather, the software is given physical existence to make certain desired physical things happen.

*South Central Bell,* 643 So.2d at 1246–47 (citations omitted).[16]

The Supreme Court of Louisiana further rejected the idea that "while the intellectual processes [of software] may be embodied [in the physical medium,] the logic or intelligence of the program is an intangible property right" that is the real object of the transaction sought to be taxed. *Id.* at 1248 (citation omitted). According to the court, such reasoning confuses the corporeal computer software *copy* with the incorporeal *right* to the software. The court observed that the purchaser actually ac-

quires a copy of the software and it is the physical copy, not the copyright, which directs the purchaser's computer or equipment. *Id.* Thus, the court concluded that the computer software constituted tangible physical property. *See also American Bus. Info., Inc. v. Egr,* 264 Neb. 574, 650 N.W.2d 251 (2002) (concluding customized and noncustomized data provided electronically or on computer disks, magnetic tapes and CD–ROMs, constituted tangible personal property because: (1) the statute required a broad construction of "tangible personal property" to encompass all personal property that is not intangible property in the narrow, traditional sense, *i.e.,* rights and obligations created by law; (2) a purchaser of a tangible manifestation or embodiment of intellectual property acquires only property rights in that manifestation, not any rights to the intellectual property; and (3) even data received electronically can be stored, while intangibles cannot be physically stored).[17]

The Commonwealth also notes that some jurisdictions apply the "incidental to service" test to determine whether a taxable transfer of tangible personal property or a nontaxable provision of a service has occurred. This test has been described as follows:

Under this test, "sales tax will not apply to transactions where the rendering of a service is the object of the transaction, even though tangible personal property is exchanged incidentally." 85 C.J.S.2d, Taxation, § 2018, p. 976. The "inciden-

---

**16.** *Accord South Central Utah Tel. Ass'n, Inc. v. Auditing Div. of the Utah State Tax Comm'n,* 951 P.2d 218 (Utah 1997).

**17.** Other jurisdictions draw distinctions between canned and custom software, concluding that canned software constitutes tangible personal property and custom software does not. The general bases for these decisions is that canned software is prepared for general

and repeated use with little modification for a specific user while custom software is more akin to a service because it is developed for a specific user and not of broad application. *See generally Measurex Sys., Inc. v. State Tax Assessor,* 490 A.2d 1192 (Me.1985); *Hasbro Indus., Inc. v. Norberg,* 487 A.2d 124 (R.I. 1985).

tal to service" test looks objectively at the entire transaction to determine whether the transaction is principally a transfer of tangible personal property or a provision of a service.... If the consideration paid in a transaction is not paid for the transfer of the tangible property, but for the service provided, and the transfer of the tangible property is only incidental to the service provided, the transaction is not a sale at retail....

*Catalina Mrtg. Sales Corp. v. Department of Treasury,* 470 Mich. 13, 678 N.W.2d 619, 626 (2004). The incidental to service test requires consideration of: (1) the object sought by the buyer; (2) the seller's business; (3) whether goods were provided as a retail enterprise with a profit-making goal; (4) whether the tangible goods could be sold without the service; (5) the extent that the intangible product or service contributed to the value of the tangible product transferred; and (6) any other factors relevant to the transaction. *Id.* at 627. In *Catalina Marketing,* the court rejected the essence of the transaction test, concluding that it focused exclusively on the perspective of the purchaser rather than on the entire transaction as required by the incidental to service test. We discern little practical difference, however, between the essence of the transaction test and the incidental to service test, at least in the present context. Under either approach, the mechanism of transfer is irrelevant, in the first case because the essence of the sale—the commodity for which money is paid—is the computer program itself, and in the other because the physical transfer of a disk or other physical media is simply incidental to the purchase of the ability to use the program developed by the seller.

After a review of the various approaches described above, we are persuaded that the essence of the transaction test is the most logical and practical. Unlike the approach followed by the Department, which focuses solely on the medium of transfer, the essence of the transaction test does not exalt form over substance; it results in the uniform tax treatment of all canned software; and it avoids the potential for parties to structure their transactions to avoid tax liability. Finally, it does not leave in limbo the nature of a license, like those evidently at issue here, to use software originally transmitted on a disk, but later substantially altered by electronically downloaded upgrades. In sum, we conclude that it is the nature of the software itself, not the package in which it comes, which must determine whether the software and accompanying license is tangible personal property.

Determining this nature, of course, is the difficult question, and one upon which even those courts adopting the essence of the transaction test have disagreed. When the General Assembly defined tangible personal property as "corporeal personal property,"[18] did it have in mind the traditional sense of that term, i.e., only those items of physical matter that one can see with the naked eye and hold in one's hand? It would appear from the list of items included in the definition, such as electricity, cable, video programming and telecommunications services, that the legislature did not intend to limit the taxable subject to such a narrow construct. We agree with the Supreme Court of Louisiana that a purchaser of canned computer software is acquiring more than incorporeal knowledge or an intangible right; rather, the purchaser is acquiring an electronic

---

**18.** Black's Law Dictionary (8th ed.) defines "corporeal" as "[h]aving a physical, material existence; tangible," *id.* at 368, and "corpore-al property." as "[p]roperty that can be perceived, as opposed to incorporeal property." *Id.* at 1253.

copy of a computer program that is stored on a computer's hardware, takes up space on the hard drive and can be physically perceived by checking the computer's files. It remains in the computer and operates the program each time it is used.

In addition, we believe that the state of the law prior to the 1997 amendments to the Code support this view of legislative intent. At that time, the Code defined "sale at retail" to include computer programming services, which expressly included *custom* computer software programs and programming, but did not mention canned software. Unlike custom software, canned software is generally marketed at retail, it is not created for a specific user and is sold in mass quantities. In the 1980s and 1990s, canned software was typically purchased in tangible form, in a box and "off-the-shelf." No one disputes that canned software was properly taxable in 1997. Since the legislature did not include prewritten or canned software programs when defining computer programming services, nor otherwise specifically mention it as a taxable item, we must infer that the General Assembly deemed canned computer software to fall within the general definition of tangible personal property. Otherwise, we would have to conclude that the legislature intended to impose a sales or use tax on custom but not canned software, an absurd result.

Finally, our review of the present Code as well as the legislative journals documenting the discussion surrounding the 1997 Act does not support a conclusion that the legislature intended to or did in fact change the law with respect to canned computer software. While the 1997 Act deleted computer programming services (and, thus, custom computer software) from the definition of a "sale at retail," thereby eliminating them as a taxable service, there is no indication that "tangible personal property" as defined should no longer be construed to include canned computer software. Moreover, the nature of canned software has not changed, only the variety of ways of conveying it to the purchaser. While we are not bound by the Department's statement of policy set forth at 61 Pa.Code § 60.19, we conclude that it properly interprets the Code to the extent that it states that the sale of canned software remains subject to tax as the sale of tangible personal property, and that the Board correctly so ruled. Further, as we have already stated, we disagree with the Department to the extent it has issued revenue rulings and now argues that the taxability of a transaction involving canned software hinges on whether the software is conveyed on a tangible medium. We conclude that the sale of all canned software, whether transmitted electronically or on a physical medium, is taxable as the sale of tangible personal property. Accordingly, since Graham purchased licenses to use canned software, the sales tax was properly imposed.

Based on the foregoing, the order of the Board is affirmed.[19]

### ORDER

AND NOW, this 15th day of September, 2005, the order of the Board of Finance and Revenue in the above-captioned matter is hereby AFFIRMED. Judgment shall become final unless exceptions are

---

19. We note that Graham has made a very general substantive due process argument, contending that imposition of a tax on licenses to use canned software is unconstitutional because the legislature repealed the tax on computer programming services and canned software programs are not specifically defined to constitute tangible personal property. Based upon our discussion above, we find no merit to this contention.

filed within thirty days of this order pursuant to Pa. R.A.P. 1571(i).

DISSENTING OPINION BY President Judge COLINS.

I dissent. The renewal of a license to use canned computer software is not subject to sales tax under the explicit terms of the Tax Reform Code of 1971 (Code).[1]

Sales tax is imposed on the sale at retail of tangible personal property or services. Section 202(a), 72 P.S. § 7202(a). "Sale at retail" encompasses the transfer for consideration of the ownership, custody or possession of tangible personal property, including the grant of a license to use or consume tangible personal property. Section 201(k)(1), 72 P.S. § 7201(k)(1). "Tangible personal property" is

> corporeal personal property including, but not limited to, goods, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use, prepaid telecommunications, premium cable or premium video programming service, spirituous or vinous liquor and malt or brewed beverages and soft drinks, interstate telecommunications service ... and charged to a service address in this Commonwealth, intrastate telecommunications service....

Section 201(m), 72 P.S. § 7201(m). Exclusions from imposition of the sales tax include the sale at retail of personal computers and single-user licensed software purchased with a personal computer; the exclusion does not include the sale at retail of multiple-user licensed software.

The multiple-user license renewals at issue in the present case fall outside the statutory definition of tangible personal property, and absent a change in the statutory definition of tangible personal property, the Commonwealth may not by regulation, or policy statement, impose the sales on the renewal of multiple-user software licenses. I see no reason to consult the tax practice and policy of other states. By the statute's explicit terms, the renewal of multiple-user licenses to use canned computer software is not a transfer of tangible personal property or a license to use tangible personal property.

---

1. Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §§ 7101–8297. P.L. 6, *as amended,* 72 P.S. §§ 7101–8297.