IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Friends Boarding Home of Western   :
Quarterly Meeting,   :
  :
                            Petitioner   :
  :
                  v.   : No. 332 F.R. 2018
  : Argued: June 7, 2021
Commonwealth of Pennsylvania,   :
  :
               Respondent  :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION
BY JUDGE WOJCIK                         FILED: July 14, 2021


        In this charitable exemption case, Friends Boarding Home of Western Quarterly Meeting (Friends) petitions for review of the order of the Commonwealth of Pennsylvania, Board of Finance and Revenue (F&R) sustaining a decision of the Department of Revenue's (Department) Board of Appeals (BOA) that denied Friends' Application for Sales Tax Exemption (Application). Friends argues that F&R erred in denying Friends' appeal and upholding the Department's denial of a sales and use tax exemption on the basis that Friends did not meet the statutory requirement of "community service" under Section 5(d) of the Institutions of Purely Public Charity Act (Charity Act).[1] Also, before this Court is Friends' unopposed Verified Motion for Judicial Notice (Motion) requesting this Court to take judicial

_____

[1] Act of November 26, 1997, P.L. 508, *as amended*, 10 P.S. §§375(d).

notice of its Form 990 for 2019. For the reasons that follow, we grant Friends' Motion, and we affirm F&R's decision.

## I. Background

According to the parties' Stipulation of Facts, Friends is a nonprofit corporation formed in 1901. Friends does business as Friends Home, a senior living community in Kennett Square, Chester County, Pennsylvania. Friends is affiliated with the Religious Society of Friends (Quakers), with members of the Quaker community serving on its board of directors. Friends was formed for the purpose of providing and maintaining a home for aged or infirmed persons of limited means to have a permanent living place at moderate costs. Friends provides independent living and skilled nursing care. Stipulation of Facts (S.F.), 11/17/20, Nos. 1-3, 5.

Friends is exempt from federal income tax as a Section 501(c)(3) charitable organization under the Internal Revenue Code, 26 U.S.C. §501(c)(3). Based on its exempt status, Friends uses Internal Revenue Service Form 990 (Return of Organization Exempt from Income Tax) to report income to the federal government. Friends relies on three sources of revenue: rates charged to residents, investment income, and donations. Friends provided Form 990s to the Department showing sources of revenue and expenses for years 2012 through 2018. S.F. Nos. 4, 6, 8, 11 and Exhibit Nos. 3-9.

Friends provided rate schedules for years 2012 through 2019. The rates are periodically set by the board of directors to fulfill the mission, while also permitting Friends to sustain operations. Friends subsidizes its rates. Friends attempts to set its rates lower than other institutions in the surrounding area, but sufficient to meet its operating budget. The parties provided the 2014-2018 Directories of Licensed Personal Care Boarding Homes (Directories) in Chester

2

County, which was secured from the Chester County Department of Aging Services and includes rates charged by similar facilities. Based on the Directories, three facilities charge less than Friends; nine facilities charge more. S.F. Nos. 15-26, Exhibit Nos. 12-23.

In 2014, Friends received a large bequest in the amount of $2,721,702, which it uses to offer financial assistance to residents who cannot afford the customary rates. The amounts of financial assistance provided has varied from year to year:[2]

| Year | Residents Receiving Financial Aid | Total Residents | Financial Assistance Provided |
|------|-----------------------------------|-----------------|-------------------------------|
| 2014 | 10 | 93 | $40,000 |
| 2015 | 8 | 84 | $60,000-$70,000 |
| 2016 | 8 | 59 | $100,000 |
| 2017 | 8 | 66 | $100,000 |
| 2018 | 11 | 55 | $80,000 |
| 2019 | 13 | 56 | $110,000 |

*See* S.F. Nos. 34-35.

Friends deferred two applications because the requesting residents did not meet the requisite standard for financial assistance. In 2016, two residents left the facility because of a lack of funds; three left in 2019 for the same reason; and two left in 2020. Friends subsidizes activities for its residents, such as outings. Friends does not accept Medicare or any other government assistance. S.F. Nos. 31-40; Supplemental Stipulation of Facts (S.S.F), 4/27/21, Nos. 1-2.

In 2017, Friends filed the Application with the Department seeking an exemption from the sales and use tax as an institution of purely public charity. On

---

[2] When these figures are averaged, Friends spent approximately $82,500 a year on nine residents, which represents 15% of its resident population.

May 26, 2017, the Department denied the Application upon determining that Friends did not donate or render gratuitously a substantial portion of its services. Friends timely appealed to the BOA, which similarly denied the appeal upon concluding that Friends did not meet the "community service" requirement under Section 5(d)(1)(v) of the Charity Act, 10 P.S. §375(d)(1)(v). The BOA declined to provide analysis regarding the remaining criteria and noted that its decision did not imply that Friends had met the remaining criteria for a purely public charity. S.F. Nos. 41-44.

From this decision, Friends timely appealed to F&R, which again concluded that Friends was not exempt on the basis of the statutory "community service" requirement under the Charity Act. F&R explained:

> [Friends] has failed to establish that it donates or renders gratuitously a substantial portion of its services because its uncompensated goods or services, in the aggregate, do not equal at least 5% of the institution's costs of providing the goods or services. Specifically, [F&R] finds that net operating losses cannot be used to determine uncompensated goods or services. In 2016, [Friends'] costs of providing the goods or services totaled $3,694,067. Thus, [Friends] was required to show that $184,703.35 in uncompensated goods or services was provided.
>
> A review of the evidence indicates that [Friends] provided $128,324 in financial assistance to residents. While [Friends] identified other uncompensated goods or services provided, it was unable to monetize any additional amounts. Since [Friends'] uncompensated services failed to equal 5% of the institution's costs of providing the services, it failed to meet this prong of the community service requirement.

F&R Decision, 4/4/18, at 7. F&R determined that Friends satisfied the other statutory criteria for exemption, but F&R never addressed the constitutional qualifications. *See id.*

4

Friends now petitions this Court for review.[3]  Friends has also filed an unopposed Motion seeking judicial notice of its Form 990 for 2019, which we shall treat as a motion to amend the Stipulation of Facts and grant.[4]

## II. Issues

Friends asserts that F&R erred in denying its appeal and upholding the Department's denial of a sales and use tax exemption.  F&R erred in determining that Friends did not meet the "community service" requirement of the Charity Act on the basis that Friends did not demonstrate that its uncompensated services, in the aggregate, equaled at least 5% of the cost of providing the services, despite the fact that it consistently had operating deficits in excess of that amount.  F&R correctly determined that Friends met the other constitutional and statutory requirements to qualify for tax-exempt status as an institution of purely public charity, including that it benefits an indefinite class of persons who are legitimate subjects of charity.

## III. Discussion
### A. Services Donated or Rendered Gratuitously

Friends contends that F&R erred by denying its Application for exemption on the sole basis that Friends did not meet the statutory requirement that it donates or renders gratuitously a substantial portion of its services.  More particularly, F&R determined Friends failed the quantitative community service

---

[3] This Court's review in this matter is "de novo in nature, with no record being certified by [F&R]."  Pa. R.A.P. 1571; *Andrews v. Commonwealth*, 196 A.3d 1090, 1096 (Pa. Cmwlth. 2018).  "Although the Court hears these cases under its appellate jurisdiction, the Court functions essentially as a trial court."  *Andrews*, 196 A.3d at 1096 (citation omitted).  Our decision is based on either a record created before this Court or, as in this case, stipulated facts.  *Graham Packaging Co., LP v. Commonwealth*, 882 A.2d 1076, 1077 (Pa. Cmwlth. 2005).

[4] The Stipulation of Facts includes copies of Friends' Form 990 for years 2012 through 2018 as exhibits.  *See* S.F. Exhibit Nos. 3-9.  At the time the parties filed the Stipulation of Facts, Friends' Form 990 for year 2019 was not yet available.

5

requirement under Section 5(d)(1)(v) of the Charity Act, which provides that "[u]ncompensated goods or services which in the aggregate are equal to at least 5% of the institution's costs of providing goods or services." 10 P.S. §375(d)(1)(v). In determining that Friends did not meet this requirement, F&R concluded that net operating losses cannot be used to determine uncompensated goods or services. F&R offered no rationale for this conclusion. Friends argues that F&R's interpretation is absurd because any charity that consistently provides services below costs will have a net operating loss. F&R's holding is at odds with the plain language of the Charity Act and prior judicial precedent, which call for a comparison of the full costs of providing the services and any lesser fees received. Comparing Friends' program service revenues with total expenses shows that Friends receives substantially less than its total cost of providing services. Friends spends a portion of its investment income and donations to subsidize the cost of care for all its residents. Without its investment income and donations, Friends would run a deficit year after year based solely on program service revenues and costs. When Friends' net operating losses are factored into the calculation, Friends maintains that it clearly meets the 5% threshold under the Charity Act.

To qualify for a tax exemption from any Pennsylvania tax, including the sales and use tax, an entity must prove that it is an institution of "purely public charity" under *both* the Pennsylvania Constitution[5] and the Charity Act, in that sequence. *Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County Board of Assessment Appeals*, 44 A.3d 3, 9 (Pa. 2012); *Community Options, Inc. v. Board of Property Assessment, Appeals & Review*, 813 A.2d 680, 683 (Pa. 2002). "[I]f you do not

---

[5] Article VIII, Section 2(a)(v) of the Pennsylvania Constitution provides that the General Assembly may by law exempt from taxation institutions of purely public charity. Pa. Const. art. VIII, §2(a)(v).

6

qualify under the [constitutional] test, you never get to [the Charity Act]." *Mesivtah Eitz Chaim of Bobov*, 44 A.3d at 9. Generally, the question of whether an institution qualifies under the Charity Act should not be addressed until after a determination is made under the constitutional test. *Id.*

To satisfy the constitutional requirements for a "purely public charity," an institution must satisfy the five-part "*HUP* test" set forth by our Supreme Court in *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985) (*HUP*). The *HUP* test requires that an institution possess all of the following characteristics:

(a) Advances a charitable purpose;

(b) *Donates or renders gratuitously a substantial portion of its services;*

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; *and*

(e) Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317 (emphasis added).

With regard to whether an entity meets the second prong of the *HUP* test, we must examine the totality of the circumstances to determine whether it appears from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the services it provides. *Id.* at 1315 n.9. As our Supreme Court has explained: "The word 'substantial' does not imply a magical percentage. It must appear from the facts that the organization makes a bona fide effort to *service primarily those who cannot afford the usual fee*." *Id.*

In *In re Appeal of Dunwoody Village*, 52 A.3d 408, 419 (Pa. Cmwlth. 2012), this Court applied the *HUP* test and held that a nonprofit continuing care

7

facility did not render services gratuitously, despite suffering operating losses and providing uncompensated services. The facility involved 65 "country houses," 174 apartments, 81 assisted living units, and an 81-bed skilled nursing facility. *Dunwoody Village*, 52 A.3d at 422-21. Of this large population base, the facility provided financial assistance to only eight or nine individuals annually. *Id.* at 412. The facility charged hefty entry fees, which ranged from a low of $82,000 to a high of $237,000 in 2008, in addition to substantial monthly fees. *Id.* at 418, 421. The facility did not accept any Medicaid patients in any of its facilities, including its skilled nursing facility. *Id.* at 418. The fact that the facility consistently suffered net operating losses had no bearing on whether the facility donated or rendered gratuitously a substantial portion of its services. *Id.* at 419. Thus, this Court held that the facility in *Dunwoody Village* did not satisfy the second prong of the *HUP* test. *Id.*

Similarly, in *Menno Haven, Inc. v. Franklin County Board of Assessment and Revision of Taxes*, 919 A.2d 333 (Pa. Cmwlth. 2007), a retirement facility that provided nonobligated care to its Medicaid residents, who comprised 30% of its population and required assistance paying fees, still failed to make a bona fide effort to service primarily those who could not afford its fees. In determining it did not meet this prong of the *HUP* test, we considered the following factors: (1) 30% was less than the 48.5% level held constitutional in *In re St. Margaret Seneca Place v. Allegheny Board of Property Assessment, Appeals and Review*, 640 A.2d 380 (Pa. 1994); (2) the facility charged a hefty entrance fee of $45,000 to $225,000, depending on the unit chosen to fund uncompensated services provided; (3) all but a small percentage of Medicaid residents were Medicaid eligible within 60 days following admission; and (4) the rest of the Medicaid residents came from within

8

the existing community. *Menno Haven*, 919 A.2d at 341-42. The majority of its residents were required to prove that they had sufficient financial resources to pay the entrance fees and required monthly fees for years in advance and were Medicare eligible. *Id.* at 337. Only on rare occasions did the facility accept a Day One Medicaid eligible[6] person from outside the community. *Id.* at 339-43. The facility's Medicaid resident population was less than 30% and only 14% of its nursing facility population was admitted from outside of the community. *Id.* at 340. The trial court found, and this Court agreed, that the facility in *Menno Haven* did not have a charitable intent for serving its residents who transitioned from the independent living facilities into the skilled care facilities because it had already accepted a large amount in fees from those residents. *Id.* at 343.

In *St. Margaret Seneca Place*, the Supreme Court determined that the facility met this prong of the *HUP* test because it provided shelter and care for many residents who could not afford the cost of their care. Over 48% of the nursing home residents were Medicaid recipients, which covered only two-thirds of the patients' costs, with the nursing home making up the difference. 640 A.2d at 383. The home operated at a loss and planned to continue doing so as a result of its commitment to serve all applicants without regard to their financial means, their insurance, or the adequacy of government payments on their behalf. *Id.* at 382. The Supreme Court stated that "[t]he decision to accept Medicaid payments to help defray the cost of care for residents is perfectly consistent with a finding that the nursing home advances a charitable purpose." *Id.* at 383. "The partial subsidy of the costs of caring

---

[6] "'Day One Medicaid eligible' is defined as an individual who is eligible for nursing facility services under the Commonwealth's Medicaid program, or becomes eligible for nursing facility services under the Commonwealth's Medicaid program within [60] days of the date of the individual's admission to a nursing facility." *Menno Haven*, 919 A.2d at 340 n.9 (citing 55 Pa. Code §1187.21a(g)(I)).

for an elderly patient is unquestionably a charitable act." *Id.* at 383-84. The Supreme Court determined that the home satisfied the second prong because it bore one-third of the costs of care for half its residents, had an open admissions policy, and never discriminated against a Medicaid recipient. *Id.*

After meeting the *HUP* test's constitutional qualifications, an institution must also satisfy the corresponding statutory elements set forth in Section 5 of the Charity Act, 10 P.S. §375. *Dunwoody Village*, 52 A.3d at 413 n.4. Section 5 of the Charity Act provides that an entity must have a charitable purpose; operate entirely free of a private profit motive; donate or render gratuitously a substantial portion of its services; benefit a substantial and indefinite class of persons who are legitimate subjects of charity; and relieve the government of some of its burden. 10 P.S. §375; 61 Pa. Code §32.1. The Charity Act's requirements track those set forth in the *HUP* test and are frequently referred to as the "quantitative" elements for determining whether an institution qualifies as an institution of purely public charity. *Dunwoody Village*, 52 A.3d at 413 n.4. Satisfaction of the quantitative elements of the Charity Act does not automatically constitute satisfaction of the constitutional criteria; they are separate tests. *See Dunwoody Village*, 52 A.3d at 419. Once a taxpayer has met both the *HUP* test and the statutory requirements, it is considered an institution of purely public charity.

With regard to whether an entity "donates or renders gratuitously a substantial portion of its services" under the statutory requirements, the General Assembly added specific criteria, referred to as the "community service" requirement. Section 5(d) of the Charity Act, 10 P.S. §375(d).

The "community service" requirement is satisfied if the entity provides "[u]ncompensated goods or services which in the aggregate are equal to at least 5%

10

of the institution's costs of providing goods or services." Section 5(d)(1)(v) of the Charity Act, 10 P.S. §375(d)(1)(v). Section 5(d)(4)(i) of the Charity Act defines uncompensated goods or services in several ways, including the following:

> The full cost of all goods or services provided by the institution for which the institution has not received monetary compensation *or the difference between the full cost and any lesser fee received for the goods or services, including the cost of the goods or services provided to individuals unable to pay*.

10 P.S. §375(d)(4)(i) (emphasis added). This statutory definition clearly invites a comparison between the "full cost" of providing services and "any lesser fee received." *See id.*; *see also Alliance Home of Carlisle, Pennsylvania v. Board of Assessment Appeals*, 919 A.2d 206, 219 (Pa. 2007); *Pocono Community Theater v. Monroe County Board of Assessment Appeals*, 142 A.3d 110, 119 (Pa. Cmwlth. 2016)

In *Alliance Home*, the Supreme Court examined the community service requirement's 5% test and compared total operating revenues and total expenses. The Court opined:

> [I]t was undisputed that appellant operated at an overall loss and provided uncompensated goods and services to its residents that totaled 17.94% of its total cost of providing goods and services to all residents, which meets the statutory requirement that, "[t]he institution must donate or render gratuitously a substantial portion of its services." 10 P.S. §375(d)(1).

919 A.2d at 219.

Similarly, in *Pocono Community Theater*, this Court examined the community service requirement's 5% test and determined it required a comparison between total operating revenues and total expenses. We held: "[I]n order to

11

determine whether the value of uncompensated goods or services rises to the level of at least 5% of the institution's costs, we need to determine the difference between the theater's *full cost of providing services and the total fees it has received*." 142 A.3d at 119 (emphasis added). We then applied this test in the following manner:

> In 2010, [the theater] had a total of $309,573 in income from ticket sales and other sources. Its expenses for providing all of its services totaled $431,905. The difference between [the theater]'s income and expenses results in a deficit of $122,332. As such, the only way [the theater] was able to have net income at the end of the year was through contributions and membership sales, which are a type of charitable donation and not a fee. Because 5% of $431,905 is $21,595.25, [the theater] was uncompensated for more than 5% of its goods and services.

*Id.* (footnote omitted).

Here, F&R denied Friends' Application upon determining that Friends did not meet the community service requirement under the Charity Act. However, before addressing the statutory requirement, we must first examine whether Friends gratuitously renders a substantial portion of its services under the second prong of the *HUP* test. *Mesivtah Eitz Chaim of Bobov*, 44 A.3d at 9; *see Dunwoody Village*, 52 A.3d at 419. Compared to *Dunwoody Village* and *Menno Haven*, Friends charges a moderate entrance fee of $4,000. Friends maintains that it charges rates that are below average and incurs operating deficits that it covers with funds generated from investments and contributions. Friends contends that, because its rates are subsidized, every resident benefits and some residents receive additional financial assistance. However, according to the Stipulation of Facts, Friends charges fees between $3,000-$5,665 per month, depending on the unit. Such monthly rates are comparable to rates charged by its for-profit competitors between $2,090-$4,715.

12

*See* S.F. Exhibit No. 19; *see also* Petitioner's Brief at 4-5; Respondent's Brief, Appendices B and C.

If a resident cannot afford to pay, Friends may either decline admission or require the resident to leave. S.F. Nos. 32, 36, 39, 40 and Exhibit Nos 24-25. *Cf. Dunwoody Village*, 52 A.3d at 412 ("Once admitted, [Dunwoody Village]'s residents will never be evicted for inability to pay. However, they may be evicted for willful refusal to pay despite the ability to pay."). Friends only provides financial assistance to those in need and who have resided at the facility for more than two years. *See* S.F. Exhibit Nos. 24-25. Friends limits the amount of assistance to $2,000 per month or $40,000 for a lifetime. S.F. Exhibit No. 25. In other words, a qualifying resident that receives $2,000 per month in aid will only be able to receive assistance for a maximum of 20 months. Friends continues to care for a resident only if he or she can afford services with the limited financial assistance it provides at its discretion. Those who cannot afford to stay have had to leave. S.F. Nos. 39, 40. Between 2016 and 2019, seven residents left due to lack of funds. S.F. No. 40.

Between 2014 and 2019, Friends provided an average of $82,500 in financial assistance annually to an average of 15% of its resident population, which equates to roughly $9,000 of aid to approximately nine recipients.[7] In *Dunwoody Village*, the facility similarly provided financial assistance to a "very small number of individuals" – only eight or nine people received "*some* financial assistance" out of its 559 units. 52 A.3d at 419 n.6 (emphasis in original). Although Friends' percentage is certainly larger by comparison than the facility in *Dunwoody Village*, the number of individuals actually helped is still quite small. Friends aids a smaller

---

[7] To break this down further, assuming a resident qualifying for financial assistance lived in a category I personal care unit, which in 2019 cost $3,250 a month, or $39,000 per year, *see* S.F., Exhibit No. 18, Friends provided only $9,000 in annual assistance.

percentage of its residents than the facility in *Menno Haven* (compare Friends' average 13% to *Menno Haven's* 30%), which failed this prong.

In addition, Friends does not accept Medicaid. The acceptance of Medicaid is not required to qualify as a purely public charity. *See Lutheran Home v. Schuylkill County Board of Assessment Appeals*, 782 A.2d 1, 5 (Pa. Cmwlth. 2001) ("A charitable purpose does not require the resident to be destitute."). "The absence of indigent residents who receive no government support is . . . not, standing alone, enough to disqualify a nursing home from an exemption as a purely public charity." *Lutheran Home*, 782 A.2d at 5. However, Medicaid patients are manifestly legitimate subjects of charity. *Dunwoody Village*, 52 A.3d at 420. The fact that Friends does not accept Medicaid, although not determinative, does not support its position.

When one compares the totality of the circumstances presented here to the totality presented in other cases, such as *Dunwoody Village* and *Menno Haven*, it is hard to conclude that Friends has met this constitutional prong. Although Friends does not charge a hefty entrance fee compared to *Dunwoody Village* and *Menno Haven*, Friends does not accept Medicaid; it charges fees comparable to its for-profit competitors; it only admits individuals who can afford its services with the use of personally available financial resources; and it only provides limited financial assistance to a small portion of its population at its discretion and only after the resident meets a two-year residency requirement. The percentage of residents – 15% – receiving assistance with the fees does not rise to constitutional level. *See St. Margaret Seneca Place*; *Dunwoody Village*; *Menno Haven*. All told, Friends does not make a bona fide effort to service primarily those who cannot afford the fees. Compared to the facilities in *Dunwoody Village* and *Menno Haven*, Friends has

14

similarly failed to establish that it donates or renders gratuitously a substantial portion of its services under the second prong of the *HUP* test. Consequently, it is unnecessary to determine whether Friends meets the corresponding community service test in Section 5(d)(1)(v) of the Charity Act. *See Dunwoody Village*, 52 A.3d at 419.

**B. Indefinite Class of Persons Who Are Legitimate Subjects of Charity**

Next, Friends contends that it benefits an indefinite class of persons who are legitimate subjects of charity. Friends provides benefits to the elderly, who are a substantial and indefinite class of persons and a legitimate subject of charity. Friends provides services to elderly residents, who are not predetermined in number. Friends maintains that this constitutes an indefinite class of subjects of charity.

To satisfy the third prong of the *HUP* test, an institution must benefit a substantial and indefinite class of persons who are legitimate subjects of charity. *HUP*, 487 A.2d at 1317. "The aged in need of medical care are legitimate objects of charity." *St. Margaret Seneca Place*, 640 A.2d at 383. This Court recognizes that

> our senior citizens are appropriate objects of charity not solely on the basis of financial need but also on the basis of emotional, social and physical challenges which increase with age. Stated differently, senior citizens are the proper objects of charity as a result of all the special needs associated with their age.

*Grace Center Community Living Corporation v. County of Indiana*, 796 A.2d 1008, 1013-14 (Pa. Cmwlth. 2002). We have also stated:

> The essential feature of a public use is that it is not confined to privileged individuals, but is open to the *indefinite* public. It is this indefinite or unrestricted quality that gives it its public character . . . and none the less so because a vast majority of the citizens will certainly never

15

> derive any benefit from its use. It is enough that they may
> do so if they choose.

*Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals*, 692 A.2d 1136, 1141 (Pa. Cmwlth. 1997), *aff'd*, 714 A.2d 397 (Pa. 1998) (emphasis in original) (quoting *Donohugh's Appeal*, 86 Pa. 306, 313 (1878)); *accord Dunwoody Village*, 52 A.3d at 419-20.

In *Dunwoody Village*, we determined that the facility did not satisfy this constitutional requirement because the beneficiaries of the services were senior citizens who could initially afford its fees and costs, not the general public at large. 52 A.3d at 420. In other words, the facility's "financially well-qualified clients [did] not constitute an indefinite class of persons who are legitimate subjects of charity." *Id.*

Similarly, in *Menno Haven*, the facility did not benefit an indefinite class of people but mostly persons with sufficient financial resources to gain admission. While the entity in *Menno Haven* occasionally admitted "Day One Medicaid eligible" persons from outside of the community, the facility primarily catered to "well-to-do-elderly" within the Menno Haven community. 919 A.2d at 333-34. The facility had a low population of Medicaid recipient residents, between 25% and 28%. *Id.* at 334. The facility did not have a charitable intent in serving those residents because it had already received a large amount of fees, including a hefty entrance fee from the residents. *Id.*

Both *Menno Haven* and *Dunwoody Village* are instructive here. Friends only admits individuals who can afford its services with the use of personally available financial resources. Once admitted, Friends continues to care for a resident only if he or she can afford services with the limited financial assistance Friends provides, at its discretion, to a relatively small percentage of its population. Friends

16

also excludes Medicaid recipients from its facility. This represents a finite – not an indefinite – class of subjects of charity. *See Dunwoody Village*; *Menno Haven*. Therefore, Friends fails to meet the third prong of the *HUP* test.

## IV. Conclusion

Having determined that Friends failed to meet the second and third prongs of the *HUP* test, we will not address the remaining constitutional[8] or statutory factors. Accordingly, we affirm.[9]

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

---

[8] F&R does not dispute that Friends meets the other criteria under the *HUP* test.

[9] It is well settled that this Court may affirm on other grounds where the grounds for affirmance exist. *Thorpe v. Commonwealth*, 214 A.3d 335, 339 n.8 (Pa. Cmwlth. 2019).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Friends Boarding Home of Western   :
Quarterly Meeting,                      :
                                      :
                    Petitioner   :
                                        :
             v.            : No. 332 F.R. 2018
                                        :
Commonwealth of Pennsylvania,   :
                                        :
                 Respondent  :

## **O R D E R**

AND NOW, this 14th day of July, 2021, Petitioner's unopposed Verified Motion for Judicial Notice (Motion), which we treat as a motion to amend the parties' Stipulation of Facts, is GRANTED, and the attached Internal Revenue Service Form 990 for year 2019 is accepted as an exhibit thereto. The order of the Commonwealth of Pennsylvania, Board of Finance and Revenue, dated April 4, 2018, is AFFIRMED. Unless exceptions are filed within thirty (30) days pursuant to Pa. R.A.P. 1571(i), this Order shall become final.

_____
MICHAEL H. WOJCIK, Judge