# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Downs Racing, LP, | : |
| Petitioner | : |
| | : |
| v. | : Nos. 201 and 202 F.R. 2013 |
| | : Argued: June 9, 2016 |
| Commonwealth of Pennsylvania, | : |
| Respondent | : |

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY
SENIOR JUDGE PELLEGRINI                FILED: July 11, 2016


Downs Racing, LP (Taxpayer) appeals from two orders of the Board of Finance and Revenue (Board) sustaining a decision of the Department of Revenue's (Department) Board of Appeals denying its reassessment and refund petitions for sales and use tax paid pursuant to various contracts with third parties in the operation of its business.[1]

---

[1] Because the parties were unable to stipulate to the pertinent facts, Taxpayer submitted trial depositions and/or evidence per this Court's December 10, 2015 Order. The evidence includes the January 26, 2016 deposition of David Parfrey, Taxpayer's Director of Finance, who was involved on behalf of Taxpayer when the Department conducted the audit in this matter and prepared Form REV-39, Sales & Use Tax Appeal Schedule (Form REV-39), worksheets identifying all of Taxpayer's charges relating to each of the third parties (Teleview Racing Patrol, Inc. (Teleview), MRI Contract Staffing (MRI), and IGT), during the period of the audit, with a description for each. In his deposition, Mr. Parfrey testified to various aspects of Taxpayer's relationship with the third parties, including terms of the contracts, charges made and taxes paid on the charges, and specific details regarding the invoices. Also included in the evidence are the contracts between Taxpayer and the third parties, Form REV-39s for the third

**(Footnote continued on next page…)**

**I.**

Taxpayer is a Pennsylvania limited partnership registered to do business in Pennsylvania under the fictitious name Mohegan Sun at Pocono Downs. During the period of January 1, 2005, through December 31, 2008 (Audit Period), Taxpayer operated a harness racing track, off-betting locations, and a casino resort, which also had 2,500 slot machines. All of the gaming activities at the casino resort are regulated by the Pennsylvania Gaming Control Board and other state agencies.

In Pennsylvania, pursuant to Section 202(a) of the Tax Reform Code of 1971 (Code),[2] a tax of six percent of the purchase price is "imposed upon each separate sale at retail[3] of tangible personal property or services, as defined herein, within this Commonwealth…." 72 P.S. §7202(a) (footnote added). A tax of six percent is also imposed on the use within the Commonwealth of tangible personal property purchased at retail "and on those services described herein purchased at retail…." 72 P.S. §7202(b). The use tax "shall be paid … by the person who makes such use as herein provided, except that such tax shall not be paid … by such person where he has paid the [sales] tax imposed by [Section 202(a) of the

---

**(continued…)**

parties, a sampling of Teleview's invoices, all of MRI's invoices with corresponding employee timecards, and all of IGT's invoices and a sampling of IGT's invoices concerning daily royalty fees. Notwithstanding the parties' inability to agree on a Stipulation, the operative facts gleaned from this evidence are not in dispute.

[2] Act of March 4, 1971, P.L. 6, No. 2, *as amended*, 72 P.S. §7202(a).

[3] What constitutes a "sale at retail" is enumerated in Section 201(k) of the Code.

2

Code]…." *Id.* "Use" is defined in Section 201(o)(1) to include "[t]he exercise of any right or power incidental to the ownership, custody or possession of tangible personal property and shall include, but not be limited to transportation, storage or consumption." 72 P.S. §7201(o)(1).

Additionally, Section 201(f) of the Code defines "purchase at retail" to include:

> (1) ***The acquisition for a consideration of the*** ownership, ***custody or possession of tangible personal property*** other than for resale by the person acquiring the same ***when such acquisition is made for the purpose of consumption or use, whether such acquisition shall be absolute or conditional, and by whatsoever means the same shall have been effected***.
>
> (2) The acquisition of a license to use or consume, and ***the rental or lease of tangible personal property***, other than for resale regardless of the period of time the lessee has possession or custody of the property.

72 P.S. §7201(f) (emphasis added).

After conducting an audit of Taxpayer's records for the Audit Period, the Department determined that Taxpayer's total sales and use tax for the Audit Period was $1,208,796.86, of which Taxpayer reported $869,240.54. As a result, in March 2011, Taxpayer was issued a Notice of Audit Assessment assessing it: (1) sales and use tax of $339,556.32; (2) interest of $75,181.47; (3) an understatement penalty of $16,977.82; and (4) a major understatement penalty of $8,360.77, for a total amount due of $440,076.38.

Taxpayer then filed a petition for reassessment with the Department's Board of Appeals (Board) regarding application of the sales and use tax to certain contracts which it claims did not involve transactions involving tangible personal property. Taxpayer also sought a refund in the amount of $12,959.10 for use tax self-assessed with respect to a transaction with its vendor, IGT, a manufacturer of gaming machines, as royalty/licensing fees. The Board bifurcated the petition and issued two decisions. In one decision, the Board sustained the assessed tax, plus interest, and abated the imposed penalties. In the other decision, the Board denied Taxpayer's refund request in its entirety. Taxpayer then filed a petition for review and a petition for refund with the Board, and the Board denied both petitions. This appeal followed.[4]

## II.

## A.

A matter no longer in dispute between Taxpayer and the Commonwealth that was at issue before the Board involves a contract with MRI Contract Staffing (MRI) to assist Taxpayer with the process of interviewing and hiring all new staff members needed to open its casino in November 2006. MRI charged Taxpayer the payroll costs for the employees plus a percentage upcharge, and charged sales tax on the difference between the pre-tax invoice amount and the payroll cost to MRI of the employees who were providing the services reflected on the invoice, that is, the "upcharge amount." The Commonwealth in its brief now

---

[4] In appeals from decisions of the Board, this Court has the broadest scope of review because it functions as a trial court, even though such cases are heard in this Court's appellate jurisdiction. *Kinsley Construction, Inc. v. Commonwealth*, 894 A.2d 832 (Pa. Cmwlth. 2006).

concedes that this is not the sale of personal property and that $2,942, plus interest in sales and use tax, is not owed. Accordingly, we will reverse the Board on this issue.

**B.**

**1.**

The item that involves the largest assessment of tax – $247,891, plus interest – involves a May 2005 Services Agreement between Taxpayer and Teleview Racing Patrol, Inc. (Teleview) under which Teleview was to provide "a highly integrated and complicated audio visual service to basically produce [Taxpayer's] live show as well as bring in … simulcast feeds from other racetracks." (Parfrey January 25, 2016 Deposition at 17.) In providing the telecast and the simulcast feeds, Teleview placed physical equipment, ranging from televisions to switchers, in Taxpayer's facility. The Services Agreement required Teleview to "provide, install, [and] maintain certain equipment and materials [as specified in the Services Agreement.]" (*Id.* at 22-23.) Moreover, Teleview was to "provide all necessary and appropriate personnel at the Track to operate the equipment to be furnished by it and all such personnel shall be under its supervision and control…."[5] (*Id.* at 23.) The personnel was "there to operate the equipment, the cameras, everything needed to produce the video aspect of [the] show, as well as operate the equipment to bring the signal in from the other racetracks." (*Id.* at 21.)

---

[5] Under the agreement between Taxpayer and Teleview, labor personnel fell under Teleview's supervision and control and, thus, Teleview provided their workers' compensation insurance.

5

Races at the racetrack were also simulcast to other racetracks and to Taxpayer's off-track wager sites (OTWs). At Taxpayer's racetrack, the live feeds were displayed on monitors located in various areas throughout the facility. Teleview also provided part of the race security services, recorded and maintained copies of the live racing at the racetrack, and provided the copies to the Harness Racing Commission in the event of a protest or other dispute as to the legitimacy of a race. During the Audit Period, Taxpayer paid Teleview $4,132,053.93 under their agreement.

Taxpayer argues that Teleview's closed circuit television services/simulcast services are not taxable services under Section 202(a) of the Code because they do not meet the definition of tangible personal property as established by Section 201(m).[6] It argues that the main purpose of the contract was

---

[6] "Tangible personal property" is defined by Section 201(m) of the Tax Code, 72 P.S. §7201(m), as:

> Corporeal personal property including, but not limited to, goods, wares, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use, prepaid telecommunications, premium cable or premium video programming service, spirituous or vinous liquor and malt or brewed beverages and soft drinks, interstate telecommunications service originating or terminating in the Commonwealth and charged to a service address in this Commonwealth, intrastate telecommunications service with the exception of (i) subscriber line charges and basic local telephone service for residential use and (ii) charges for telephone calls paid for by inserting money into a telephone accepting direct deposits of money to operate, provided further, the service address of any intrastate telecommunications service is deemed to be within this Commonwealth or within a political subdivision, regardless of how or where billed or paid. In the case of any such interstate or

**(Footnote continued on next page…)**

6

for Teleview to produce Taxpayer's simulcast feed to provide audio and visual images and to record or film the races and exhibit the event live and on replay for those in Taxpayer's premises, including customers placing wagers on OTWs. Taxpayer contends that just because the use of equipment is required to create and deliver the services provided by Teleview does not mean that those services are subject to taxation because "[m]ost services, both those subject to tax and those not, require the service provider to use equipment …. [but a] service that can be provided without using any [tangible personal property] is the exception." (Petitioner's Brief at 17.)[7]

---

**(continued…)**

> intrastate telecommunications service, any charge paid through a credit or payment mechanism which does not relate to a service address, such as a bank, travel, credit or debit card, but not including prepaid telecommunications, is deemed attributable to the address of origination of the telecommunications service.

[7] As an additional reason to support its contention that the simulcast services were not taxable, Taxpayer makes the "true object" test adopted in *Graham Packaging Company, LP v. Commonwealth*, 882 A.2d 1076 (Pa. Cmwlth. 2005), applicable in determining that the services it provided were not taxable. The "true object" test as provided in *Graham* applies:

> [W]hen a transaction appears to involve both tangible and intangible property or tangible property and a service. In order to determine whether a taxable sale of tangible personal property has occurred, ***the test focuses on whether the essence or true object of the sale is tangible personal property or intangible property or a service with tangible property serving only as the medium of transmission.*** If the essence of the transaction or true object of the transaction is the intangible property or service, the intangible object/service does not assume the taxable character of the tangible property serving as the medium of transfer.

882 A.2d at 1083 (emphasis added). Even if the "true object" of the transfer was for intangible personal property, it does not make taxable items non-taxable.

The Commonwealth does not disagree with Taxpayer's position that such services are not subject to the sales or use tax if they are separately stated on the invoice from items that were subject to the sales and use tax. The items subject to the tax in the contract were equipment used to provide audio and visual images and to record or film the races and exhibit the event live and on replay for those in Taxpayer's premises, including customers placing wagers on OTWs. Given that Taxpayer has taken possession of this equipment, including cameras and other audio visual equipment, and Teleview was obligated to "provide, install and maintain" the equipment, that sufficiently meets Section 201(f)'s definition of "purchase at retail" and "tangible personal property." Therefore, those items are taxable.

The Commonwealth then points us to Section 201(g)(4) of the Code, which requires in pertinent part:

> Where there is a transfer or retention of possession or custody, whether it be termed a rental, lease, service or otherwise, of tangible personal property … the full consideration paid or delivered to the vendor or lessor shall be considered the purchase price, even though such consideration be separately stated and be designated as payment for processing, laundering, service, maintenance, insurance, repairs, depreciation or otherwise. Where the vendor or lessor supplies or provides an employe to operate such tangible personal property, the value of the labor thus supplied may be excluded and ***shall not be considered as part of the purchase price if separately stated*** ….

72 P.S. §7201(g)(4) (emphasis added).[8] The Commonwealth asserts that the invoices involving services contain no description of or amounts relating to the services, and neither was any charge for claimed exempt services specified in the Taxpayer's contract. Because Taxpayer's possession of the equipment invoiced by Teleview is a taxable use and the purchase prices are the amounts indicated on the invoices, Taxpayer has not proven the "separately stated" cost of services associated with the equipment operation. Taxpayer responds that the invoices *do* separate out services from equipment, but the Commonwealth counters that those invoices do not state what services are taxable and what are non-taxable so they are not "separately stated."

The Code requires that every sale of tangible personal property or services thereon shall be presumed to be at retail and be subject to sales tax. Persons liable for sales and use taxes or for the collection of such taxes must keep records as required by the Department. *See* Section 271 of the Code, 72 P.S. §7271. 61 Pa. Code §34.2(a)(2) requires that the taxpayer keep, as a minimum for practicable enforcement, certain sales tax records that are amenable to a three-point audit. One of the audit points requires that a taxpayer keep records in a certain way so that an otherwise non-taxable transaction remains so:

---

[8] Section 236 of the Code, 72 P.S. §7236, provides that "[i]n all cases of petitions for reassessment, review or appeal, the burden of proof shall be upon the petitioner or appellant, as the case may be." A taxpayer appealing an adverse decision of the Board with respect to a petition for refund of sales taxes paid has the burden to prove facts requiring reversal, and the government is not required to prove facts necessary to sustain an order of assessment. *Anastasi Brothers Corporation v. Board of Finance and Revenue*, 315 A.2d 267, 270 (Pa. 1974); *see also Fiore v. Commonwealth*, 668 A.2d 1210 (Pa. Cmwlth. 1993*), affirmed per curium*, 690 A.2d 234 (Pa. 1997).

9

> Sales tax records shall be maintained from which it is possible to ascertain the vendor's compliance with the taxing and exemption features of the act, that is, whether sales made without collection of tax were in fact nontaxable. The records shall describe items sold without tax, and show those sales which were made tax free because the purchase price was less than the amount at which the statute begins to impose tax. This is the first essential for determining the amount of tax incurred in the vendor's business.

61 Pa. Code §34.2(a)(2)(i)(A).

The question here, then, is whether it is possible from Taxpayer's sales tax records – the invoices – to determine if sales made without collection of tax were, in fact, non-taxable by being separately stated as required by 72 P.S. §7201(g)(4).

Taxpayer provided a sampling consisting of seven of Teleview's sales invoices for the service period of September 7-13, 2008. The invoices generally indicate the category of the charge, the number of days charged, the charge per day or week, and the total charge. For Taxpayer's various OTWs, the invoices separate charges into categories such as "Closed Circuit TV System, Audio System & Downlink Dishes" and "Large Screen DLP TV's [sic]." The invoice for Taxpayer's Live Racing and/or Simulcasting Performances lists charges for "Closed Circuit Television Systems and Services," "26" LCD TV's [sic] and Wall Mounts for Dial-A-Bet," and "140 – 15" Color LCD TV's [sic]." Another invoice lists various labor charges, including "Labor for Simulcast Only Days" for three days, "Labor for Live Racing and Simulcast Days" for four days, and includes the

10

State Minimum Wage Differential and the Labor Differential for the Technical Director. A final, separate invoice states a charge for "One Third of Pennsylvania Area Technician Manager Labor."

Also submitted as evidence is Form REV-39, Sales & Use Tax Appeal Schedule (Form REV-39), and an Excel worksheet prepared by David Parfrey, Taxpayer's Director of Finance, which states all of Teleview's charges during the Audit Period, including those of the above invoices, with a description of either "Closed Circuit Television Service" or "Help Supply Labor CCTV" that correspond to each charge. Form REV-39 also indicates the value of each charge, the state tax for the charge, and an accounts payable county tax of $0 for each charge.

The auditor's summary of the invoices for the Teleview charges were similarly fashioned, with descriptions of charges as either "CCTV Equipment Rental" or an occasional "Help Supply Labor," and indicated that the tax paid on these charges was $0 across the board.[9]

---

[9] During his deposition, Mr. Parfrey was asked to compare four descriptions on the auditor's summary, all stating "CCTV Equipment Rental" with the actual invoices:

> Q: Okay. In your view is the phrase that the auditor has used in [the summary of Teleview's charges] of, quote, CC TV [sic] equipment rental, close quote, an accurate description of what actually appears on the actual invoices?
>
> A: It is not.
>
> Q: Let's take the first document again, the first invoice 79289 and instead of saying the words CC TV [sic] equipment rental,

**(Footnote continued on next page…)**

Upon review of the evidence, we find that neither the auditor nor this Court can determine from the submitted invoices what was billed for taxable services versus non-taxable services because they were billed together as one item on the invoice. Although the invoices separate charges such as "Closed Circuit TV System, Audio System & Downlink Dishes" from "Large Screen DLP TV's [sic]," all taxable tangible property, the invoices do not separate taxable service charges from non-taxable service charges such as those billed for the installation or service of said equipment. Because non-taxable services for simulcasting were not separately stated from taxable services relating to the service and installation of the

---

**(continued…)**

> what does it really say is the items [sic] at issue here or the items being invoiced?
>
> A:      It says closed circuit television systems and services.
>
> Q:      The auditor at page 13 of Exhibit P-2 … characterizes the Teleview contract as involving the, quote, sale and installation of audio visual equipment and therefore concludes that it's a sale of what's referred in the tax rule as tangible personal property. Do you think it's an accurate description of what's going on there to call it sale and installation of audio visual equipment?
>
> A:      I do not.
>
> Q:      In what way is that inaccurate?
>
> A:      This is not a, this is not purely a rental of equipment. They are producing and packaging a live show, not only a live show that we are running three to four days a week, but they are also handling the transmission of signals in from around the country and putting them onto TVs for our patrons to wager on.

(Parfrey January 25, 2016 Deposition at 31-32.)

12

equipment charges, those services are presumed to be taxable as part of the purchase price under 61 Pa. Code §33.2(a)(3).[10]

**2.**

Alternatively, Taxpayer contends that Teleview's labor charges in installing and maintaining the equipment are exempt from sales and/or use tax because the charges qualified as "help supply services" under 61 Pa. Code §60.4(a) for which Teleview assessed no upcharge.

Pursuant to Section 201(cc) of the Code, "help supply services" are subject to tax. "Help supply services" are defined in pertinent part as:

> ***Providing temporary or continuing help where the help supplied is on the payroll of the supplying person or entity, but is under the supervision of the individual or business to which help is furnished.*** Such services include, but are not limited to, service of a type provided by labor and manpower pools, employe leasing services, office help supply services, temporary help services, usher services, modeling services or fashion show model supply services.

72 P.S. §7201(cc) (emphasis added).[11]

---

[10] Pursuant to 61 Pa. Code §33.2(a)(3), "Amounts included in the taxable portion of the purchase price include: … [t]he charge for labor, service or alteration."

[11] 61 Pa. Code §60.4 further defines "help supply service" as "[t]he providing of an individual by a vendor to a purchaser whereby the individual is an employe of the vendor and the work performed by the individual is under the supervision of the purchaser. (i) The term includes the type of service provided by labor and manpower pools, employe leasing services, **(Footnote continued on next page…)**

13

Moreover, in *SEI Investments v. Commonwealth*, 890 A.2d 1130 (Pa. Cmwlth. 2006), where a taxpayer's printing equipment was supplied by a contractor and operated by the contractor's employees, the taxpayer argued that it should be exempt from paying taxes on its printing services because it did not have to *perform* its own printing services, but rather simply *provide* the services.[12] Finding that the contractor's operation of the equipment was sufficient to deny the in-house printing exemption sought by the taxpayer, we affirmed the Board's decision to deny the refund, reasoning:

> Here, [taxpayer's] contention that the nature of the operation is the controlling factor, not the identity of the operator, is not supported by the plain language of [61 Pa. Code § ]32.36(a)(4). The regulation requires that the in[-]house printing be performed by "employees." The only logical construction of this requirement is that taxpayer's employees must perform the printing services. This construction is supported by the remainder of subsection (4). As written, the regulation clearly contemplates that the taxpayer is performing the printing services and not an outside contractor. Otherwise, it would not be necessary to specify that the printing activities cannot be an integrated part of the taxpayer's other business activities [see subsection (4)(iv)] or that such activities are of a sufficient scope that they could be conducted on a separate commercially viable basis [see subsection (4)(v)]. Obviously, here, the printing activities are of a sufficient scope that they can be conducted on a separate, commercially viable basis

---

**(continued…)**

office help supply services, temporary help services, usher services, modeling services or fashion show model supply services."

[12] We note that Section 201(k) of the Code and 61 Pa. Code §32.36 provide guidance specifically relating to printing operations and related businesses.

because [the contractor] is performing them on that very basis for a fee. ***If [the contractor] performed these services for [the taxpayer] at its own facilities, there is no doubt such services would be taxable. The fact that [the contractor] has agreed to provide the same services at [the taxpayer's] premises using [the contractor's] own equipment and personnel does not change the taxability of the service. Whether the printing services are performed at [the taxpayer's] premises or [the contractor's], [the taxpayer] has contracted with a separate entity, which uses its own personnel and equipment to meet [the taxpayer's] printing requirements.***

*SEI Investments*, 890 A.2d at 1136-37 (emphasis added).

Under its contract with Taxpayer, Teleview was obligated to "provide, install and maintain" the equipment at issue on Taxpayer's various properties. In doing so, Teleview provided its own personnel, whom it supervised and controlled. If Teleview had performed these services for Taxpayer at its own facilities, these services would be taxable. As such, Teleview's performance of such services with its own personnel for Taxpayer at Taxpayer's premises does not change the taxability of the services.

## C.

The other transaction for which Taxpayer challenges its reassessment involves a 2006 Intellectual Property Agreement (IP Agreement) between Taxpayer and IGT, under which IGT licensed to Taxpayer the intellectual property needed to operate its poker machines. Pursuant to the IP Agreement, Taxpayer, as licensee, was granted a "qualified right and license to Third Party Intellectual

Property," which is defined as "all patents, trademarks, copyrights and trade secrets … that IGT licensed for incorporation into a Multi-Hand Poker Game." (IP Agreement at ¶¶1-2.) In turn, Taxpayer paid IGT royalty fees of $15 or $20 per day per slot machine – depending on the type of slot machine – on the poker games. As daily royalties, Taxpayer paid IGT an aggregate sum of $215,985.00 during the Audit Period. Taxpayer argues that the $12, 959 in sales and/or use tax is not due on the licensing fees it paid to IGT because the licensing of intellectual property does not fall under the definition of tangible personal property or any of the taxable services enumerated in Section 201 of the Code, 72 P.S. §7201.

Addressing whether software licenses are tangible personal property, in *Dechert, LLP v. Commonwealth*, 942 A.2d 210, 212 (Pa. Cmwlth. 2008), this Court reasoned:

> First, pursuant to Section 201(k)(1), a taxable "sale at retail" includes the "transfer, for a consideration, of the ownership, custody or possession of tangible personal property, *including the grant of a license to use or consume....*" 72 P.S. §7201(k)(1) (emphasis added). Clearly, a license to use tangible personal property is subject to tax. Second, as the Commonwealth notes, [the taxpayer] continues to confuse the corporeal software program with the intangible right to use and copy the software. **The object of the transaction is the computer program, not the license. Absent the program, the license is useless; it is the program, stored on the computer hardware, which enables the user to perform the desired tasks or functions.**

(Emphasis added.) *See also Graham Packaging Company, LP v. Commonwealth*, 882 A.2d 1076 (Pa. Cmwlth. 2005) (where, under the "essence of the transaction"

16

or "true object" standard, renewals of licenses to use canned software were sales at retail of "tangible personal property" and, therefore, subject to sales tax; software was not merely incorporeal knowledge or intelligence, but was a physically arranged matter that animated computers; and it did not matter whether the initial or upgraded versions of the software were acquired in disk form or electronically).

Similarly, the IP Agreement between Taxpayer and IGT licensed Taxpayer the intellectual property it needed in order to operate its poker machines. Without the intellectual property, Taxpayer could not use or operate its poker machines. Thus, the object of the transaction is the intellectual property and not the license. Further, just because the Code does not expressly mention "intellectual property" in its definition of "tangible personal property" does not mean that it does not constitute tangible personal property. *See Dechert*, 942 A.2d at 212 ("we conclude that the Code's definition of 'tangible personal property' is not rendered ambiguous merely because the statute fails to expressly state that software licenses constitute tangible personal property….").

Accordingly, the orders of the Board are affirmed in part and reversed in part. They are affirmed insofar as they relate to Taxpayer's contracts with Teleview and IGT, and this matter is reversed and remanded to the Board to recalculate Taxpayer's taxes due on its contract with MRI.

_____
DAN PELLEGRINI, Senior Judge

Judge McCullough did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Downs Racing, LP, :
               Petitioner :
                :
         v. : Nos. 201 and 202 F.R. 2013
                :
Commonwealth of Pennsylvania, :
               Respondent :

# **O R D E R**

AND NOW, this 11th day of July, 2016, the orders of the Board of Finance and Revenue dated January 30, 2013, at Nos. 1111828 and 1211315, are affirmed insofar as they relate to Downs Racing, LP's contracts with Teleview and IGT, and are reversed and remanded to the Board to recalculate Downs Racing, LP's taxes due on its contract with MRI. This Order shall become final unless exceptions are filed within thirty (30) days pursuant to Pa. R.A.P. 1571(i).

_____
DAN PELLEGRINI, Senior Judge