SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
CHIEF JUSTICE, SAYLOR
In this direct appeal, we consider whether sales or use taxes must be paid in relation to two distinct items: the purchase of a closed-circuit horse-racing simulcasting system, and the payment of royalties for intellectual property used in conjunction with the operation of video poker machines.
Sales and use taxes are provided for in Pennsylvania's Tax Reform Code of 1971 (the "Code").[1] Sales taxes pertain to retail sales of tangible personal property, whereas use taxes are levied on the use of tangible personal property purchased at retail when sales taxes have not been paid. Section 7202 of the Code imposes these taxes as follows:
(a) There is hereby imposed upon each separate sale at retail of tangible personal property or services, as defined herein, within this Commonwealth a tax of six per cent of the purchase price, which tax shall be collected by the vendor or any other person required by this article from the purchaser, and shall be paid over to the Commonwealth ....
(b) There is hereby imposed upon the use ... within this Commonwealth of tangible personal property purchased at retail ... and on those services described herein purchased at retail ..., a tax of six per cent of the purchase price, which tax shall be paid to the Commonwealth by the person who makes such use as herein provided, except that such tax shall not be paid to the Commonwealth by such person where he has paid the tax imposed by subsection (a) of this section or has paid the tax imposed by this subsection (b) to the vendor with respect to such use....
72 P.S. § 7202(a), (b).[2]
Some of the terms in the above provisions, including "tangible personal property,"
*606 "purchase at retail," "sale at retail," and "use," are defined in Section 7201 of the Code. See id. § 7201. Any such definitions will be given below as they become pertinent.
I. Background
During the relevant timeframe, Appellant Downs Racing, LP, doing business as Mohegan Sun at Pocono Downs ("Taxpayer"), operated the Pocono Downs racetrack in Wilkes Barre, as well as several off-track wagering ("OTW") locations in Pennsylvania.[3] Taxpayer also built and operated a casino resort adjacent to the racetrack containing, inter alia , video poker machines.
For its OTW operations, Taxpayer entered into a service contract with Teleview Racing Patrol, Inc., pursuant to which Teleview supplied equipment such as screens, satellite dishes, and closed-circuit television feeds. These items were used to provide live displays at each OTW facility of races occurring at Pocono Downs and other tracks across the country. Teleview provided the equipment for this system and, per the agreement, it also supplied personnel to install, maintain, and operate that equipment. In relation to the video poker games, Taxpayer purchased machines from International Gaming Technologies, PLC ("IGT"), on which it paid taxes which are not in dispute. In accordance with a separate intellectual property agreement, Taxpayer also paid IGT royalty fees for intellectual property associated with the various different "themes," i.e. , different poker games that would run on the machines. Taxpayer self-assessed taxes of approximately $13,000 on such royalty payments.
The Department of Revenue commenced an audit of Taxpayer's business activities from January 1, 2005, to December 31, 2008 (the "audit period"). At the conclusion of the audit, the Department assessed Taxpayer approximately $340,000 in unpaid sales and use taxes for the audit period, most of which stemmed from Taxpayer's payments to Teleview under the service contract.[4] The Department additionally assessed interest and penalties, although it later abated the penalties.
Taxpayer paid the $340,000 to avoid accruing additional interest. However, it lodged an administrative appeal challenging the assessment. Separately, Taxpayer concluded that it had erroneously paid the $13,000 in taxes on its payment of royalty fees to IGT; thus, it sought a refund of those monies. After the Department denied relief, Taxpayer sought review of both matters in the Commonwealth Court, which consolidated the appeals.
A three-judge panel of the Commonwealth Court affirmed in relevant part in a published opinion. See Downs Racing, LP v. Commonwealth , 143 A.3d 511 (Pa. Cmwlth. 2016).[5] In discussing the Teleview payments, the court explained that, under the service agreement, Teleview was paid for "a highly integrated and complicated audio visual service to basically produce [Taxpayer's] live show as well as bring in ... simulcast feeds from other racetracks." Id. at 514 (quoting N.T., Jan. 25, 2016 at 17 (deposition of David Parfrey, Taxpayer's Director of Finance) ). Even if *607 these charges did not all involve the purchase of tangible personal property,[6] the panel noted, Taxpayer's records reflected that Teleview consolidated taxable and nontaxable charges on its invoices. The panel thus concluded that Taxpayer had failed to present documentary evidence specifying which portions of the billed amounts were nontaxable, as required by departmental regulations. See 61 Pa. Code § 34.2(a)(2)(i)(A).
In this latter regard, the court acknowledged that, where a transfer of tangible personal property such as audio-video equipment occurs, and the vendor provides employees for its operation, the value of labor can be subtracted from the purchase price in calculating the taxes due, so long as each item is separately stated in the taxpayer's records. See 72 P.S. § 7201(g)(4) ("Where the vendor or lessor supplies or provides an employe to operate such tangible personal property, the value of the labor thus supplied may be excluded and shall not be considered as part of the purchase price if separately stated."). On review of the sampling of seven invoices provided during the audit and the documents prepared by Taxpayer's finance director, however, the court concluded that Taxpayer's documentation was insufficiently detailed to distinguish nontaxable labor -- such as that for the operation of the equipment -- from taxable labor, such as that for servicing the equipment. See id. (including within the taxable price of a purchased item "the full consideration paid," including monies designated as payment for, inter alia , servicing, maintenance, and repairs); see also 61 Pa.Code § 33.2(a)(3) ("Amounts included in the taxable portion of the purchase price include: ... [t]he charge for labor, service or alteration.").[7] As such, the panel determined that Taxpayer was liable for taxes on all of the invoiced labor.
Separately, the panel observed that Taxpayer sought application of the "true object" or "essence of the transaction" test. Under that standard, Taxpayer argued, because the primary purpose of the Teleview contract was the provision of nontaxable audio-visual services (i.e. , the real-time display of horse races at Pocono Downs and the OTW locations), all of the Teleview charges were nontaxable. See Downs Racing , 143 A.3d at 515 n.7 (citing Graham Packaging Co., LP v. Commonwealth , 882 A.2d 1076, 1083 (Pa. Cmwlth. 2005) (explaining that "the test focuses on whether the essence or true object of the sale is tangible personal property or intangible property or a service with tangible property serving only as the medium of transmission") ). The panel rejected this argument, *608 stating that, even if the transfer of tangible personal property was not the true object of the transaction, that circumstance did not render taxable charges nontaxable. See id. Accordingly, the court reasoned that utilization of the essence test would not entitle Taxpayer to relief.
Finally, the court rejected Taxpayer's request for a refund of the taxes it paid on the IGT royalty fees. The court initially quoted a passage of its decision in Dechert, LLP v. Commonwealth , 942 A.2d 210 (Pa. Cmwlth. 2008) (en banc ) (" Dechert I ") (holding that a license to use canned computer software comprises tangible personal property under the Code), aff'd , 606 Pa. 334, 998 A.2d 575 (2010) (" Dechert II "), and emphasized two distinct portions of the passage: the first quotes Section 7201(k)(1) of the Code, which states that a license to use or consume tangible personal property itself falls within the definition of tangible personal property, see 72 P.S. § 7201(k)(1), and the second, somewhat inconsistently, suggests that the fact a license was purchased was irrelevant because the true "object of the transaction" was the "corporeal" software itself and not the license. Downs Racing , 143 A.3d at 519 (quoting Dechert I , 942 A.2d at 212 ). The panel in the present case elected to follow the latter formulation, ultimately concluding:
Similarly, the IP Agreement between Taxpayer and IGT licensed Taxpayer the intellectual property it needed in order to operate its poker machines. Without the intellectual property, Taxpayer could not use or operate its poker machines. Thus, the object of the transaction is the intellectual property and not the license. Further, just because the Code does not expressly mention "intellectual property" in its definition of "tangible personal property" does not mean that it does not constitute tangible personal property.
Id. at 519-20 (citing Dechert I , 942 A.2d at 212 ). As can be seen from the above, the court substituted the concept of "intellectual property" where Dechert I had spoken of computer software, although it did not elaborate on this distinction or explain why it believed the Code treats intellectual property identically to computer software.
After the Commonwealth Court overruled Taxpayer's exceptions, see Downs Racing, LP v. Commonwealth , 174 A.3d 1174, 1177 (Pa. Cmwlth. 2017) (en banc ), Taxpayer appealed as of right to this Court, see 42 Pa.C.S. § 723(b), again challenging the Department's assessment with regard to the Teleview contract as well as its refusal to refund the taxes tendered in connection with the IGT royalty payments.
II. Payments to Teleview
Taxpayer maintains that, pursuant to the true-object, or essence-of-the-transaction, test, the amounts charged by Teleview were not subject to sales tax, as the true object of the overall agreement between it and Teleview was the provision of intangible (and thus nontaxable) simulcasting services. As Taxpayer observes, in utilizing the test, the Commonwealth Court has stated that, "[i]f the essence of the transaction or true object of the transaction is the intangible property or service, the intangible object/service does not assume the taxable character of the tangible property serving as the medium of transfer." Graham Packaging , 882 A.2d at 1083. Applying this precept to the facts at hand, Taxpayer argues that neither the equipment rentals nor the performance of otherwise taxable labor by Teleview employees should be subject to sales tax. See Brief for Appellant at 16. Taxpayer thus contends that the Commonwealth Court's holding in this case -- that the individual components of the overall transaction remain taxable -- is inconsistent with the way the test has *609 been applied in the past, and "renders the test superfluous." Id. at 17, 19.
Taxpayer continues that, even if this Court were to disregard the true-object test, the Commonwealth Court erred in its conclusion that the Teleview invoices failed to separate taxable and nontaxable charges, because the audio-visual equipment, the rental of which would normally be a taxable event, see 61 Pa. Code. § 31.4(a), was exclusively operated by Teleview employees. In this regard, Taxpayer acknowledges that, ordinarily, where rented equipment is furnished together with the services of an operator, there is a presumption that the right to direct the use of the equipment is also transferred to the renter, making the rental payments taxable. See Brief for Appellant at 22 (citing 61 Pa. Code § 31.4(a)(1) ). In this case, however, Taxpayer asserts that such presumption is rebutted by evidence that the work was exclusively under Teleview's control and, therefore, the equipment rental charges were nontaxable. See id.
The Commonwealth responds that, while simulcasting services may escape taxation if billed separately, the charges presently under consideration, see supra note 4, were plainly subject to tax. According to the Commonwealth, Teleview's failure to state taxable items and services separately from those not subject to sales tax on the invoices made it impossible to determine which portions of the Teleview charges were nontaxable. That being the case, the Commonwealth maintains that Taxpayer failed to carry its burden of demonstrating which payments, or portions thereof, should have been excluded.
Initially, Taxpayer requests that we correct the Commonwealth Court's application of the true-object test so as to make it consistent with the manner in which that court has applied it in the past, thereby rendering all Teleview charges nontaxable. We note, however, that this Court has never endorsed the test, notwithstanding that the Commonwealth Court has used it on multiple occasions. The Dechert II Court did discuss it in summarizing Dechert I 's analysis, but ultimately saw no need to apply it, relying instead on established principles of statutory construction. See Dechert II , 606 Pa. at 347, 998 A.2d at 583. As in Dechert II , the governing statute and associated regulations are sufficient to resolve the present dispute; as such, we are not at liberty to ignore their requirements under the guise of a judicially-fashioned standard along the lines of the true-object test.
In applying these provisions, we observe that, because Taxpayer seeks a reassessment of its sales and use tax liability in connection with the Teleview charges, it bears the burden of proving that the assessment was erroneous. See 72 P.S. § 7236. Furthermore, Taxpayer was required to retain records of its transactions that were sufficiently detailed to demonstrate the taxable or nontaxable status of its transactions. See id. § 7271(a).
The Code imposes a six percent tax "upon each separate sale at retail of tangible personal property," or on services identified therein. Id. § 7202(a). A "sale at retail" is defined, relevantly, as "[a]ny transfer, for a consideration, of the ownership, custody or possession of tangible personal property ... whether such transfer be absolute or conditional and by whatsoever means the same shall have been effected." Id. § 7201(k). The rental of tangible personal property -- here, the televisions, satellite dishes, and other audio-visual equipment -- is, generally, a taxable transaction. Specifically, the Code provides that:
Where there is a transfer or retention of possession or custody, whether it be termed a rental, lease, service or otherwise, *610 of tangible personal property ... the full consideration paid ... to the vendor or lessor shall be considered the purchase price, even though such consideration be separately stated .... Where the vendor or lessor supplies or provides an employe to operate such tangible personal property, the value of the labor thus supplied may be excluded and shall not be considered as part of the purchase price if separately stated ....
72 P.S. § 7201(g)(4). As Taxpayer recognizes, the administrative regulations create an exception to the presumption of taxability:
If the equipment is furnished with the services of an operator, it shall be presumed that the transaction involves a transfer of the right to use or direct the use of the equipment. This presumption may be rebutted by establishing that the work to be accomplished is exclusively under the control of the person who furnished the equipment and operator.
61 Pa. Code § 31.4(a)(1). Taxpayer claims it established on the record that Teleview exclusively controlled the rental equipment, thus defeating the presumption that the transfer was taxable. In Taxpayer's view, the consequence is that it only purchased a nontaxable service, with the equipment used by Teleview as a means of delivering that service.
The evidentiary record does not support Taxpayer's position in this regard. In point of fact, the governing contract stated that Teleview undertook to provide, supervise, and control the employees who operated the equipment it furnished, see Teleview Agreement at 1, ¶ 4, R.R. 247a, but the agreement did not specify whether the work to be accomplished -- the production of simulcasting services -- would be exclusively under its control or, conversely, whether Taxpayer retained the right to direct the use of the equipment in producing the content that Taxpayer selected. See 61 Pa. Code § 31.4(a)(1). The agreement did not state, for example, that Teleview would choose which races from other tracks to simulcast at the casino, or that Teleview would provide all creative input in the production of live racing shows. Similarly, while it was undisputed that Teleview employees exclusively operated the equipment, see, e.g., N.T., Jan. 25, 2016 at 46-48, it is presumed that Taxpayer directed Teleview employees in their use of the equipment, see 61 Pa. Code § 31.4(a)(1), and none of Taxpayer's evidence suggests otherwise. Therefore, Taxpayer has not established that the rentals were nontaxable under Section 31.4(a)(1).
To the extent Taxpayer's argument subsumes a contention that charges solely for the provision of simulcasting services should have been deducted from the total amount taxed, it is relevant that the Teleview charges expressly apply to both the rental of the audio-visual equipment and the provision of simulcasting services, without differentiating the amounts for each type of charge. For example, for the period of September 7 through September 13, 2008, Teleview billed Taxpayer over $4,000 for "Closed Circuit Television Systems and Services," at a daily rate. Teleview Invoice dated Sept. 13, 2008, at 1, reprinted in R.R. 268a.[8] Taxpayer's Director of Finance, David Parfrey, acknowledged in a deposition that this charge contemplated both equipment rentals and services for the invoiced period.
*611 See N.T., Jan. 25, 2016 at 54.[9] Per the service agreement, moreover, Teleview was compensated "for the services, equipment, materials and maintenance" it furnished to Taxpayer. Teleview Agreement at 2, ¶ 6(a), reprinted in R.R.248a. In sum, then, the record does not establish the amounts that Teleview charged solely for simulcasting services separate and apart from the taxable equipment rentals.
In terms of Section 7201(g)(4)'s separately-stated requirement, it is true that Teleview's labor charges were billed independently from the amounts charged for equipment and services. As noted, however, the invoices did not identify the type of labor being performed. Rather, labor was charged at a daily rate, divided between simulcast only and live racing days. See supra , note 7. While the value of labor for the operation of rented equipment generally can be subtracted from the purchase price in calculating sales tax liability if separately stated, see 72 P.S. § 7201(g)(4), Teleview did not identify how much of the labor was for the operation of the equipment, and how much was for taxable labor, such as maintenance and repairs. See id. Because the records provided by Taxpayer are insufficiently detailed to reflect which portions, if any, of these charges are nontaxable, see 72 P.S. § 7271, Taxpayer has not shown that the cost of labor to operate the equipment involved was "separately stated," as required by Section 7201(g)(4). Thus, Taxpayer has failed to carry its burden of proving that the Commonwealth erred in its tax assessment. See id. § 7236.
III. Royalty Fees paid to IGT
Taxpayer contends that the Commonwealth Court erred in concluding that its payments of royalties or licensing fees for intellectual property used in the operation of gaming machines were properly taxed. Taxpayer emphasizes that the fees were billed separately from the purchase of the poker machines and applied, not to the machines or the software itself, but to the right to use intellectual property in the form of trademarks, copyrights, and patented methods of play, owned by third parties. Taxpayer argues that intellectual property is not tangible personal property under the Code, and hence, the fees were not subject to sales or use tax. See Brief for Appellant at 25-26; see also Reply Brief for Appellant at 11.[10]
The Commonwealth counters that Taxpayer's position is foreclosed by this Court's decision in Dechert II , which held that canned computer software is tangible property subject to sales and use tax. In this sense, the Commonwealth does not directly contradict Taxpayer's assertion that, while software may be taxable, royalty fees for the use of intellectual property such as trademarks and patented inventions are not. Instead, the Commonwealth falls back upon a more generalized contention that the "full consideration paid" for a product such as a video poker machine includes fees for ancillary items. See Brief for Appellee at 24-25 (quoting 72 P.S. § 7201(g)(4) ).
*612 The Code defines "tangible personal property" as "[c]orporeal personal property including, but not limited to, goods, wares, [and] merchandise." 72 P.S. § 7201(m) ; see supra , note 6. It lists other types of property that are taxable, not all of which are "tangible" in the common sense of the word, such as steam, telecommunications services, and video or cable programming services. See id. ; see also Dechert II , 606 Pa. at 352, 998 A.2d at 586 (Saylor, J., concurring). By its terms, however, the Code does not identify intellectual property -- such as trademarks, copyrights, and patented inventions (including processes) -- as a form of tangible personal property. Cf. BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "intellectual property" as "[a] category of intangible rights protecting commercially valuable products of the human intellect" or "[a] commercially valuable product of the human intellect, in a concrete or abstract form, such as a copyrightable work, a protectable trademark, a patentable invention, or a trade secret"). Because these legal rights are intangible,[11] it would be tenuous to suggest they are included by implication within the definitional provision as a form of "corporeal personal property," particularly in view of the precept that taxing statutes are to be strictly construed against the taxing authority. See 1 Pa.C.S. § 1928(b)(3).[12] Hence, we find salience in Taxpayer's position that these rights do not constitute tangible personal property under the Code.
Nor can the Commonwealth prevail on its argument that the trademarks, copyrights, and patented methods of play were incidental to Taxpayer's purchases of the gaming machines and, as such, were taxable as part of the machines' purchase price. The Commonwealth relies, in this regard, on Section 7201(g)(4), which provides that the purchase price for the transfer of tangible personal property is the full consideration paid, including "payment for processing, laundering, service, maintenance, insurance, repairs, depreciation or otherwise." 72 P.S. § 7201(g)(4). Presumably, the Commonwealth seeks to characterize the intellectual property royalties as falling under the "otherwise" qualifier, as none of the enumerated terms apply. However, Taxpayer demonstrated that the royalty payments to IGT for the use of intellectual property were distinct from the purchases of gaming machines and the software necessary to operate them.
Most notably in this respect, Taxpayer executed separate agreements with IGT -- one for the use of the software, and one for *613 the use of intellectual property.[13] The intellectual property thus obtained consisted of legal rights to use trademarks, copyrights, and patented methods of play. In addition, the royalty-fee charges were incurred on a daily basis, separately from the initial purchases of the machines, the operating software, and the software licenses. See N.T., Jan. 25, 2016 at 58-61. Furthermore, the intellectual property was not necessary to the function of the machines, but Taxpayer was required to purchase it to obtain the right to engage particular poker styles or games. Id. at 60 ("It's an individual who designs a theme that is unique to every other brand of poker and if you favor that type of poker and want to play that, this individual who created that intellectual property gets paid compensation for that.").
Notably, as well, Taxpayer's decisions about which intellectual property to purchase depended upon events occurring after the machines and software were in place and being used. According to Taxpayer's unrebutted testimony, these decisions were made based on the success of different poker games in terms of customer interest and revenue generation. See id. at 59 ("We could ... purchase a cabinet with software in it from IGT and if that game was not producing within a month, we could convert it to a different type of game if we wanted to."). Under these circumstances, we disagree with the Commonwealth's position that the licensing fees for intellectual property were part and parcel of Taxpayer's purchase of gaming machines from IGT.
Accordingly, as the royalty fees did not involve, nor were they ancillary to, the transfer of tangible personal property, the Department should have granted Taxpayer's request for a refund of the approximately $13,000 in sales taxes Taxpayer self-assessed in connection with those payments.
Conclusion
The Commonwealth Court's order is reversed insofar as it upheld the Board of Finance and Revenue's determination relative to the IGT contract, and affirmed in all other respects.
Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join this opinion.

Act of Mar. 4, 1971, P.L. 6, No. 2 (as amended 72 P.S. §§ 7101 -10004 ).

The above is contained in Article II, Section 202 of the Code as originally enacted. For concision, we will use the Purdon's section numbers when referring to sections of the Code.

Taxpayer had no exposure to Philadelphia or Allegheny County sales and use taxes.

The relevant payments to Teleview were stated on invoices to be for closed-circuit television equipment and services, as well as associated labor.

The panel reversed the assessment in part. See id. at 513-14. The Department has not cross-appealed from that aspect of the court's decision.

Throughout the audit period, Section 7201 of the Code defined "tangible personal property" as:
Corporeal personal property including but not limited to goods, wares, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use, prepaid telecommunications, premium cable or premium video programming service, spirituous or vinous liquor and malt or brewed beverages and soft drinks, interstate telecommunications service originating or terminating in the Commonwealth and charged to a service address in this Commonwealth ....
72 P.S. § 7201(m). In 2016 and 2017, the Legislature made revisions to the definition that do not affect the resolution of this case. See Act of July 13, 2016, P.L. 526, No. 84, § 1; Act of Oct. 30, 2017, P.L. 672, No. 43, § 1.

For example, Teleview's invoices delineated labor charges on a per-day and per-product basis - e.g. , "Labor for Live Racing and Simulcast Days" - without identifying the activity encompassed by the labor, such as operation (nontaxable) or servicing (taxable) of the equipment involved. Further, Taxpayer did not annotate the invoices to include such information.

The invoices also reflected the following equipment charges: 26? LCD TVs and Mounts for Dial-A-Bet; 140 - 15? Color LCD TVs; four charges for "Closed Circuit TV System, Audio System & Downlink Dishes;" and four instances of "Large Screen DLP [TVs]." Teleview Invoices dated Sept. 13, 2008, reprinted in R.R. at 268a - 274a.

Specifically, Mr. Parfrey clarified that the "per live racing performance and/or simulcast day fee" applied to equipment and services, and, with the exception of the television sets, did not identify which portion was exclusively for equipment rentals. Id. ; see also id. at 62 (reflecting Mr. Parfrey's testimony that only the fee for the television sets was set forth separately from service charges).

Taxpayer alternatively posits that, if the royalty fees are deemed payments for software licenses, the software here was custom-made, not canned, thereby making this case distinguishable from Dechert II . In view of our disposition, we need not address this contention.

Accord, e.g. , Ager v. Murray , 105 U.S. 126, 129-30, 26 L.Ed. 942 (1881) ; Globe Life & Accident Ins. Co. v. Okla. Tax Comm'n , 913 P.2d 1322, 1329 (Okla. 1996) ; Ralph v. Pipkin , 183 S.W.3d 362, 368 (Tenn. Ct.App. 2005) ; cf. In re Marriage of Keener , 728 N.W.2d 188, 194 (Iowa 2007) (referring to trademarks and other intellectual property rights as intangible assets); Adams Outdoor Advert., Ltd. v. City of Madison , 294 Wis.2d 441, 717 N.W.2d 803, 820-21 (2006) (quoting with approval Black's Law Dictionary 1233 (7th ed. 1999) ). See generally Nortel Networks Inc. v. State Bd. of Equalization , 191 Cal.App.4th 1259, 119 Cal.Rptr.3d 905, 912 (2011) ("Intellectual property is an intangible right existing separately from the physical medium that embodies it." (internal quotation marks and citation omitted) ); Am. Bus. Info., Inc. v. Egr , 264 Neb. 574, 650 N.W.2d 251, 256 (2002) (same).

As mentioned, the General Assembly amended the Code in 2016 and 2017. See supra , note 6. These revisions expanded the definition of tangible personal property to include such items as video, canned software, music, books, and photographs, regardless of the method of delivery -- i.e. , electronic or physical. We note parenthetically that none of the intellectual property rights at issue in this case is among the enumerated items in the amended version of Section 7201(m).

Pursuant to the IGT intellectual property agreement, the subject patents, trademarks, and other intellectual property were ultimately owned by a third party, with IGT acting as a pass-through. However, this circumstance is immaterial to our present analysis.